IN THE MATTER OF THE REVISION IN RATES FILED BY
NEW JERSEY POWER & LIGHT COMPANY, INCREAS-
ING ITS RATES FOR ELECTRIC SERVICE.

NEW JERSEY POWER & LIGHT COMPANY, PETITIONER-
APPELLANT, v. STATE OF NEW JERSEY, DEPART-
MENT OF PUBLIC UTILITIES, BOARD OF PUBLIC
UTILITY COMMISSIONERS, RESPONDENT.

Argued February 4 and 11, 1952—Reargued April 7, 1952—
Decided May 26, 1952.

501

504

Mr. *Russell Watson* argued the cause for the appellant (*Messrs. Autenrieth & Rochester*, attorneys; *Mr. Joseph F. Autenrieth*, of counsel).

Mr. *Joseph Harrison*, Deputy Attorney-General, argued the cause for the respondent, State of New Jersey (*Mr. Jacob Schwartz*, of counsel; *Mr. Edward S. Binkowski*, Deputy Attorney-General, on the brief; *Mr. Theodore D. Parsons*, Attorney-General of the State of New Jersey, attorney).

The opinion of the court was delivered by

BURLING, J. This is an appeal by New Jersey Power & Light Company (hereinafter referred to as the Utility), from a decision and order of the Board of Public Utility Commissioners, Department of Public Utilities, State of New Jersey (hereinafter called the respondent), filed April 27, 1951, ordering that proposed increased rates for electric service filed by the Utility on May 28, 1950, should not be placed in effect, and cancelling the schedules filed by the Utility in connection therewith. The appeal was addressed to the Superior Court, Appellate Division, under *Rule* 3:81–8. Prior to hearing there certification was allowed by this court upon the respondent's petition. *In re New Jersey Power & Light Co.*, 8 *N. J.* 320 (1951).

The Utility is a New Jersey corporation engaged in the business of generating, purchasing, transmitting, distributing and selling electric energy. It was incorporated under the laws of New Jersey on December 14, 1915, and maintains

its principal office at Dover, Morris County, in this State. The electric service of this corporation, at the time of the initiation of these proceedings, was rendered throughout or in portions of 105 municipalities in the western and northwestern portions of the State of New Jersey, in the Counties of Hunterdon, Mercer, Morris, Passaic, Somerset, Sussex, and Warren, a territory of approximately 1,750 square miles with a population of approximately 180,000 according to the 1940 census. During the period covered by these proceedings it was a member of what is termed the "G. P. U. power group," composed of four affiliated companies, namely Metropolitan Edison Company, New Jersey Power & Light Company, Jersey Central Power & Light Company and Pennsylvania Electric Company, all of which were subsidiaries of General Public Utilities Corporation. This group's transmission facilities were interconnected directly or indirectly with Public Service Electric & Gas Company of New Jersey, Philadelphia Electric Company, and Pennsylvania Power & Light Company through what was denominated the "Pennsylvania-New Jersey interconnection," and also were interconnected with other Pennsylvania, New York and New Jersey generating facilities.

In accordance with formal approval contained in an order of the respondent filed March 28, 1944, the Utility had entered into an automatic rate adjustment plan, developed jointly by representatives of the respondent and of the Utility. Under this plan which was known as the New Jersey Rate Adjustment Plan, rate adjustments of this utility were made annually from 1944 to 1948 inclusive. In 1949 the Utility sought the respondent's approval of a deviation from the standard application of the aforesaid Rate Adjustment Plan for a temporary rate increase pending completion by the Utility of studies which it had undertaken and believed would serve as a basis for revision of the Rate Adjustment Plan formula relating to the determination of rate of return. This temporary rate increase was denied by the respondent for the reason that no emergency or critical situation requir-

ing such relief was proved. *Re New Jersey Power & Light Co., Docket No.* 4496, 82 *P. U. R. N. S.* 554 (not officially reported). Pursuant to the authority contained in the plan as approved by the respondent, the Utility, after notice, terminated the Rate Adjustment Plan as of December 31, 1949, and on May 25, 1950, filed with the respondent the schedule of increased rates which became the source of this appeal. These rates were to become effective June 26, 1950, but on May 31, 1950, the respondent filed an order suspending the same pending hearing thereon. *R. S.* 48:2–21. Hearings before the respondent began on June 26, 1950. A subsequent hearing took place on July 13, 1950, at the close of which the proceedings were adjourned to October 9, 1950. Additional hearings were held in October and November, 1950, and at the hearing of November 21, 1950, the Utility stipulated "it will not put its proposed rates into effect before March 15th (1951), unless this Board should decide the matter prior to that time, and then it will do whatever the decision calls for." Further hearings occurred in January and February, 1951, concluding on February 21, 1951. At the last hearing the Utility stipulated that it would not put its proposed rates into effect prior to May 1, 1951. On April 27, 1951, the respondent filed its decision and order denying the proposed rate increases and the Utility appealed to the Superior Court, Appellate Division. Prior to hearing there, this court allowed certification upon respondent's petition, as hereinabove mentioned.

The questions involved on this appeal include: (1) was the respondent's determination of rate base unlawful, (2) was the respondent's decision and order illegal, arbitrary and capricious with respect to various items of revenues and expenses, (3) was the respondent's decision and order (a) arbitrary and without evidential support in its basic findings as to rate of return and (b) illegal in that it failed to find and determine a specific fair rate of return, and (4) was the respondent's denial of the Utility's proposed increase in rates a deprivation of its property without due process of law in

violation of the provisions of the Federal and State Constitutions.

Upon consideration of the arguments addressed to these questions, the applicable law and the relevant and competent evidence in the record, we are of the opinion that the decision and order appealed should be affirmed.

The ultimate decision in any rate of fare or service controversy is whether the rates are just and reasonable. The statute aims to secure justice to both sides and the court stands between the public utility and its consumers to effect a just and reasonable status. *Central R. Co. of N. J. v. Dept. of Public Utilities*, 7 *N. J.* 247, 260 (1951). The three primary factors involved in the determination of justness and reasonableness of rates are an examination of a company's property valuation which constitutes its rate base, its expenses and the rate of return developed by relating its income to its rate base. This is settled law in New Jersey. *Central R. Co. of N. J. v. Dept. of Public Utilities, supra* (*p.* 261) ; *Public Service Coordinated Transport v. State*, 5 *N. J.* 196, 216 (1950) ; *Atlantic City Sewerage Co. v. Board of Public Utility Commissioners*, 128 *N. J. L.* 359 (*Sup. Ct.* 1942), affirmed 129 *N. J. L.* 401 (*E. & A.* 1943). These factors were determined by the respondent in the present case and it is to the sufficiency of these components of its decision and order that the Utility addresses the instant appeal.

It is our duty to weigh the evidence under the pertinent legal principles and determine whether the issue of reasonableness has been properly considered and decided. *Central R. Co. of N. J. v. Dept. of Public Utilities, supra* (*pp.* 257–260) ; *Public Service Coordinated Transport v. State, supra, p.* 215; *Atlantic City Sewerage Company v. Board of Public Utility Commissioners, supra* (*p.* 364). There is, of course, a presumption in favor of the validity of the action of the respondent, since the respondent's exercise of the rate-making power involves a broad measure of legislative discretion. *Public Service Coordinated Transport v. State, supra* (*p.* 214) ; *Atlantic City Sewerage Company v.*

*Board of Public Utility Commissioners, supra* (*p.* 365); *State Board of Milk Control v. Newark Milk Co.*, 118 *N. J. Eq.* 504, 523 (*E. & A.* 1935); *O'Brien v. Public Utility Board*, 92 *N. J. L.* 587, 589 (*E. & A.* 1919); *Public Service Gas Co. v. Board of Public Utility Commissioners*, 84 *N. J. L.* 463, 467 (*Sup. Ct.* 1913), affirmed on reargument 87 *N. J. L.* 581, 597 (*E. & A.* 1915), writ of error dismissed on stipulation, 242 *U. S.* 666, 667, 37 *S. Ct.* 243, 61 *L. Ed.* 552 (1917). However this is not a "strong" or "conclusive" presumption. The respondent's determination must find *reasonable* support in the evidence. *Central R. Co. of N. J. v. Dept. of Public Utilities, supra* (*p.* 261). Compare *R. S.* 48:2–46.

Further it is provided by statute that the burden of proof to show that an increase, change or alteration in existing rates proposed by a public utility is just and reasonable shall be upon the public utility making the same. *R. S.* 48:2–21*d.* See *Central R. Co. of N. J. v. Dept. of Public Utilities, supra* (at *pp.* 255–256); *Public Service Coordinated Transport v. State, supra* (*p.* 219). Compare *Federal Power Commission v. Hope Nat. Gas Co.*, 320 *U. S.* 591, 602, 64 *S. Ct.* 281, 88 *L. Ed.* 333, 345 (1944); *Atlantic City Sewerage Co. v. Board Pub. Utility Commissioners, supra* (*p.* 369).

## I — RATE BASE

■ It is established that the rate base in a proceeding of this nature is the fair value of the property of the public utility that is used and useful in the public service at the time of its employment therein and is determined by viewing the plant as an integral and unitary whole, considering all the elements properly entering into the ascertainment of a reasonable return for supplying the public need. *Public Service Coordinated Transport v. State, supra* (at *p.* 217); *Atlantic City Sewerage Company v. Board of Public Utility Commissioners, supra* (128 *N. J. L.*, at *pp.* 365, 366).

The Utility, however, contends that the rate base determined by the respondent in the present matter results from

consideration of original cost only, to the exclusion of all other evidence of value of the property, and is therefore illegal. The respondent argues that the Utility adduced evidence as to cost and current value relating to the rate base factor, in the proceeding before the respondent, and that it gave consideration to all evidence, as is exemplified in its decision.

The guide to determine the fair value figure, the rate base, is clearly expressed in *Public Service Coordinated Transport v. State, supra* (at *pp.* 217–218), wherein Mr. Chief Justice Vanderbilt speaking for this court said:

"There are a number of formulae useful in the determination of fair value; depreciated original cost, depreciated prudent investment, reproduction cost of the property less depreciation, cost of reproducing the service as distinct from the property, and there are undoubtedly others. But the Board is not bound to and, indeed, should not use any single formula or combination of formulae in arriving at a proper rate base, for the determination of fair value is not controlled by arbitrary rules or formulae, but should reflect the reasonable judgment of the Board based upon all the relevant facts, *Atlantic City Sewerage Company v. Board of Public Utility Commissioners*, 128 *N. J. L.* 359 (*Sup. Ct.* 1942); affirmed 129 *N. J. L.* 401 (*E. & A.* 1943)."

Compare *Colorado Interstate Gas Co. v. Federal Power Comm.*, 324 *U. S.* 581, 65 *S. Ct.* 829, 89 *L. Ed.* 1206 (1945), rehearing denied 325 *U. S.* 891, 65 *S. Ct.* 1082, 89 *L. Ed.* 2004 (1945); *Petition of New England Tel. & Tel. Co.*, 115 *Vt.* 494, 66 *A. 2d* 135 (*Vt. Sup. Ct.* 1949); *New England Tel. & Tel. Co. v. State*, 95 *N. H.* 353, 64 *A. 2d* 9 (*N. H. Sup. Ct.* 1949); *Federal Power Comm. v. Hope Natural Gas Co., supra; Los Angeles G. & E. Corp. v. Railroad Comm.*, 289 *U. S.* 287, 53 *S. Ct.* 637, 77 *L. Ed.* 1180 (1933); *Miles v. West*, 151 *Md.* 337, 135 *A.* 579, 49 *A. L. R.* 1470 (*Md. Ct. App.* 1926); *Petersburg Gas Co. v. Petersburg*, 132 *Va.* 82, 110 *S. E.* 533, 20 *A. L. R.* 542 (*Va. Sup. Ct. App.* 1922); *O'Brien v. Public Utility Board, supra* (92 *N. J. L.*, at *p.* 590); *Public Service Gas Co. v. Board of Public Utility Commissioners, supra* (84 *N. J. L.*, at *p.* 475). See 43 *Am. Jur., Public Utilities and Services, Sec.* 105, *pp.* 646–647.

In the present case the Utility introduced evidence in two categories, one of which it termed historical cost and the other present value. It defined its asserted net historical cost rate base as including "original cost of the property together with the acquisition cost (where purchased from predecessor companies) plus experienced engineering and other overhead costs excluded from original cost on the Company's books, together with the estimated cost of plant in process of construction or projected to meet existing loads and service requirements," and its asserted present value rate base as "the cost new either actual or estimated of the property of Appellant reflecting price levels at December 31, 1949, less allowance for loss in value due to deterioration, obsolescence and other factors." It now asserts that the respondent rejected all the testimony and exhibits relating to the present value of its property and "used the cost rate base."

The respondent was entitled to determine the probative force of the Utility's evidence upon both of its asserted rate bases. Assuming that in doing so it eliminated for valid reasons all the Utility's evidence relating to purported "present value" as being without sufficient weight to constitute a reasonable basis for the establishment of increased rates, that fact alone would not render its decision and order invalid, for it was left with evidence of historical cost which is admissible, and if that is sufficient or substantial, competent and relevant evidence it may be considered in connection with all the circumstances of the case, for determination of a rate base. Such was the decision under comparable conditions in *Railroad Comm. of Cal. v. Pacific G. & E. Co.*, 302 *U. S.* 388, 58 *S. Ct.* 334, 82 *L. Ed.* 319, 324–325, at *p.* 326 (1938), in which case the U. S. Supreme Court held that the Utility could not successfully contend that it was not heard by the commission, that the evidence it offered was not received and considered and its competency and weight determined by the commission, or that the commission did not place its valuation upon the property and fix the rates upon that

valuation. A comparable decision was rendered in 1942 by the former Supreme Court of this State (affirmed by the former Court of Errors and Appeals on the opinion of the former Supreme Court), namely *Atlantic City Sewerage Co. v. Board of Public Utility Commissioners, supra.* In the *Atlantic City* case the utility company submitted evidence of two valuation bases, reproduction cost new less depreciation and book value, and the City of Atlantic City submitted a variant form of reproduction cost new less depreciation. The respondent's valuation, on *certiorari* proceedings to review its order, was asserted to be the acceptance of original cost without attempting to valuate such cost to reflect prevailing prices. Mr. Justice Heher, speaking for the former Supreme Court which affirmed the board's order, said (128 *N. J. L.,* at *p.* 363):

"We concur in the Board's appraisal of the property as the fair value base. Its own expert calculated the original cost of the property, less depreciation, at $2,075,985.49; and there is no reasonable basis in the proofs for a finding in excess of that sum."

Although we have in the record of this case no current testimony of calculation of original cost by an engineer or expert of the respondent, as we shall demonstrate there is sufficient or substantial competent and relevant evidence to support the respondent's calculation as to the present fair value of the Utility's property and there is no reasonable basis in the proofs in this case for a finding in excess of that sum. We proceed to the evaluation of the evidence to support these conclusions in the inverse order.

*a. Present Value Rate Base*:

Let us first examine the present value rate base theories as advanced during the testimony of the Utility's witnesses.

It was asserted by Mr. Davis that there are in general two methods followed by engineers and economists in establishing the cost of a facility expressed in terms of the current pur-

chasing power of the dollar. He testified that one is a determination of the cost of reproducing in new condition the exact facilities presently existing generally on the theorem that the property would be reproduced in its entirety as a single construction project (termed the reproduction cost method), and that the second method is the establishment of current nominal dollar cost of constructing existing facilities in new condition in a manner similar to that used by the company in the actual construction of its facilities. The reproduction cost new method, as explained by Mr. Davis, involves detailed inventory of plant and facilities in service; development of unit costs at current material prices and labor rates, to be applied to the inventory quantities; and establishment of appropriate engineering and administrative overhead charges which would be incurred in the event the theoretical construction of the property were to be carried forward on a single project or single impulse basis. He testified that this method is very expensive as it involves a tremendous volume of detailed work and because of this fact there has developed a tendency to the use of the other method. The actual cost related to current price method was described by this witness as one in which the actual costs of plant in service are adjusted "by various appropriate methods, to reflect changes in the purchasing power of the dollar." He testified that the total original cost of plant in service of the Utility on December 31, 1949, (as computed by the Utility at $38,401,189) adjusted to reflect the reduced purchasing power of the dollar at the approximate levels existing during 1949 was $56,055,450, an average upward adjustment of 43 per cent over "actual original cost." To derive a rate base on this method he testified that the gross value so derived must be reduced by an appropriate amount to reflect the actual loss in value incurred by physical deterioration, obsolescence, inadequacy, inability to meet changed conditions and requirements, and decline of economic usefulness due to loss of markets. Later in the proceedings he testified that if a present value rate base is adopted capital invested in the

business over the period of its development is permitted to receive a return having a purchasing power substantially similar to that existing on the average over the period during which capital was committed to the business. And in discussing three types of rate base (historical cost or prudent investment, original cost, and present value), he testified that "due to the wide fluctuations that have occurred in the purchasing power of the dollar it is not. probable that the present value rate base would at any time be the same as either the original cost or the historical cost bases."

(1) *Gross Current Value.*

By the Utility's own argument in this court it is admitted that its present value base as submitted reflects actual or estimated cost new of its property on price levels existing December 31, 1949. Mr. Thuerk, the Utility's president testified at the hearing on June 26, 1950, that the company estimated the "present value" of its property as of December 31, 1949, at "a figure which represents adjustment to the present level of the purchasing power of the dollar." At the hearing on June 28, 1950, counsel for the Utility stated for the record: "The purpose of this testimony ultimately will lead to the value of this property *related to the present value of the dollar.*" (Emphasis supplied.) Mr. Davis, an employee of Gilbert Associates, Inc., (engineers and consultants), a firm retained by the Utility, testified as an expert on public utility operations expressly to the effect that the basic formula used by the Utility in determining its asserted present value rate base was the "original cost of plant in service at December 31, 1949, adjusted to reflect the reduced purchasing power of the dollar at the approximate average levels existing during 1949." Mr. Edgar, a similar expert witness, testified to the effect that various methods were used in repricing the existing properties of the Utility at December 31, 1949, to reflect the purchasing value of the dollar in 1949. The sort of rate base estimate suggested by this testimony has been condemned by the U. S. Supreme Court in *West v. Chesapeake*

*P. Telephone Co.,* 295 *U. S.* .662, 671, 672, 55 *S. Ct.* 894, 79 *L. Ed.* 1640, 1647 (1935) as follows:

"\* \* \* To an extent value must be a matter of sound judgment, involving fact data. To substitute for such factors as historical cost and cost of reproduction, a 'translator' of dollar value obtained by the use of price trend indices, serves only to confuse the problem and to increase its difficulty, and may well lead to results anything but accurate and fair. This is not to suggest that price trends are to be disregarded; quite the contrary is true. And evidence of such trends is to be considered with all other relevant factors \* \* \*."

In view of the escalator factor inherent in approaching a rate base determination by the methods advanced by the Utility, careful analysis of the record becomes mandatory to determine whether on the proofs and under the circumstances surrounding the Utility and the service rendered by it to the public, the present value rate base as invoked by the Utility affords a just and reasonable basis for evaluation of the company's plant. Upon such an analysis practical limitations impel us to recite only descriptive examples of the evidence and legal principles pertinent thereto, although the entire record is the basis of our conclusion.

Before proceeding to a discussion of these significant examples of the evidence, it may be well to point out that in this case a substantial portion of the Utility's property was valued throughout the evidence at the same figure for both the historical cost and the present value rate bases submitted by it. The Utility relied on evidence of historical cost for value of land rights in both bases submitted although it introduced the testimony of its right of way engineer and other evidence of increase in cost of acquisition and development of real estate. It also introduced evidence of plant additions in 1947, 1948 and 1949 which was identical for both bases. Mr. Davis testified in this connection that "cost new of the property at present day price levels had fairly stabilized by mid-1948." Approximately $13,000,000 of these additions to property constituting the rate base by either method occurred in the year 1949. This was roughly one-third of the Utility's claimed historical cost value of its

existing plant in service on December 31, 1949, which was the basis for both of the rate bases proposed by it. Mr. Davis testified that inflation, for the purposes of this proceeding, would have little effect on the value of this portion of the Utility's property. Further evidence on rate base submitted by the Utility related to projected additions to plant for years subsequent to 1949, and this evidence was applied identically by it in the computation of its historical and present value bases. From this brief summary it is at once apparent that the Utility's current value testimony for determinative purposes affected considerably less than two-thirds of the property valued for its submitted rate bases. Of this approximately 43 per cent of the plant in service on December 31, 1949, had been installed prior to December 31, 1939.

■ It therefore follows that the escalator methods of present value determination resorted to by the Utility in this case and above described were devised to raise to current value, new, the older facilities of the company, some of which were more or less obsolete. In this connection we note that it has been held that the due process clause of the Federal Constitution does not require a rate-making commission to fix rates on the present reproduction value of something no one would presently want to reproduce. *Market Street R. Co. v. Railroad Comm. of Cal.,* 324 *U. S.* 548, 567, 65 *S. Ct.* 770, 89 *L. Ed.* 1171, 1184–1185 (1945). On the other hand, decisions of both courts and utility commissions throughout the country generally appear to recognize the doctrine that in determining rate valuations there should be taken into consideration the fact that a higher level of prices and materials has been brought about by conditions due to the devaluation of the dollar, the recent World War and the current emergency and inflationary economic situation, although with respect to facilities constructed at pre-war or pre-emergency prices the prevailing abnormally high prices of labor and materials should not be taken as the sole criterion or controlling element. See *Annotations,* 20 *A. L. R.* 555–589.

In this State it has been held that abnormally high prices for labor and material attendant upon an unstable market do not afford a just criterion of the value of property for rate purposes, although reproduction cost less depreciation is an element to be considered. *Atlantic City Sewerage Co. v. Bd. of Public Utility Commissioners, supra* (128 *N. J. L.* at *p.* 367). And valuation based *solely on pre-war average prices* is unreasonable in the face of a great reduction in the purchasing power of the dollar. *Elizabethtown, etc., Co. v. Pub. Utility Commissioners,* 95 *N. J. L.* 18, 19 (*Sup. Ct.* 1920). The United States Supreme Court has adhered to similar views, holding that when a change in price level has occurred actual experience in the construction and development of the property, especially that experienced in a recent period, may be an important check on extravagant estimates, and that although reproduction cost is a relevant fact it is not an exclusive test, emphasizing the danger in resting conclusions upon estimates of a conjectural character. *Railroad Comm. of Cal. v. Pacific G. & E. Co., supra* (302 *U. S.* at *p.* 398, 58 *S. Ct.* 334, 82 *L. Ed.* at *p.* 325). Compare *Willcox v. Consolidated Gas Co.,* 212 *U. S.* 19, 29 *S. Ct.* 192, 53 *L. Ed.* 382 (1909).

The evidence on current value of those portions of the Utility's plant so valued was developed in three major categories. One consisted of accounts (mass distribution and transmission accounts and "practically all" of the Utility's building, substation and production plant accounts) of physical property (surviving plant dollars) actually repriced at the purchasing power of the dollar in 1949 to reflect either 1949 costs actually experienced by the company or costs which allegedly would have been experienced by the company using material and labor as furnished by suppliers "who presently serve the Company" and using "indirect construction costs and overhead" which it actually experienced in 1949.

The second consisted of accounts in which surviving original cost dollars were repriced to reflect the purchasing power of

the dollar in 1949 by applying developed cost factors based upon studies completed for the accounts for which surviving original cost dollars were repriced at 1949 cost levels using published indices of the firm of Whitman, Requardt and Smith (known as the Handy trends). While the respondent properly recognized the admissibility of evidence of this character, it found that for various reasons little significance could be accorded to it under the circumstances of this case. Its conclusions in this respect find complete support in the record. To illustrate this we shall examine a few of the items discussed by the respondent in its decision.

The respondent found that no evidence of reproduction cost of the *entire* existing plant as a unit was introduced, but that to a substantial extent the unit prices developed by the Utility's experts in this connection reflected "piecemeal" construction. That the Utility recognized the weakness in this approach appears in part from the endeavor of its witness, Mr. Davis, to explain that lower construction costs of unit construction would be offset by lesser overhead costs on piecemeal construction. There is no evidence in the record to support Mr. Davis' theory on overhead expenses, and there is evidence in the record that the Utility even on relatively small jobs used an overhead loading of 10 per cent on labor and 6 per cent on materials. Mr. Edgar who determined the overhead included in the current value appraisals admitted that he had no experience in ascertaining what the overhead costs would be in reproducing a project of this size and type. The respondent stated that it is "common knowledge that for comparable types of construction, engineering and supervision costs are lower percentagewise on larger projects than on relatively smaller ones." We are unable to say that this is not a matter of which judicial notice may be taken.

The respondent found that under the Utility's approach to present value the customer "is expected to pay a return on a rate base which reflects current costs of materials and labor, while no provision is made for the customer to receive the

benefits of construction that would be installed today as compared with past construction." Mr. Allen, vice-president and general manager of the Utility, testified that facilities now being installed are sturdier than older ones and that the company is incorporating improvements in the art developed since the construction period which predated the last war (World War II). There was evidence that inspection and maintenance cost for the next few years on an old 55 MW generating unit is $55,000 per annum, and that such cost on a new 66 MW generating unit is $16,000 per annum. Mr. Davis testified that on the basis of unit cost per kilowatt of the old station as repriced to 1949 levels ($177 per kilowatt) the current cost of the old 55,000 kilowatt plant was $9,735,000, but if the plant had been built at the same unit cost as the new plant (computed to be $159 per kilowatt) the cost of the old plant would have been $8,668,000. He further testified to similar differences in annual cost of operation. This is, of course, illustrative only, but it indicates the danger and injustice to the public in basing a *fair* value determination on reproduction cost *new* of older facilities by adjusting actual cost to the current purchasing value of the dollar as attempted by the Utility under the circumstances of this case.

The respondent in analyzing the basis of the company's cost study of poles, priced on the basis of cost of installation in 1949, found that the evidence had no value. The reason advanced by the respondent and justified by the record, is that although over 70,000 distribution poles were so priced, only 4,000 had been installed in 1949 and there was no evidence to establish as a fact that these 4,000 poles were so distributed throughout the company's service areas as to reflect a *fair* cross-section of the excavation conditions associated with the installation of *all* the company's poles, nor evidence that the poles represented a reasonable cross-section of the whole number of poles in relation to size and type. The respondent observed further that the "bogey" cost, or average installation factor, used in the Utility's current cost

studies was not based upon analysis of the Utility's construction conditions and corresponding construction cost experience but was in fact a "bogey-cost" study made by the Metropolitan Edison Company at a previous date for its own construction conditions and associated construction costs. There is no sufficient competent relevant evidence of comparability in the record to support the application of this installation factor to the Utility's plant. °

As to other cost factors, the respondent found that the Utility, although charged with the burden of proof, produced no direct evidence upon which manufacturers' present cost quotations (used in the current cost study) for "equipment made some twenty years ago, and superseded by more modern equipment" could be supported. This criticism of the evidence is justified by the record.

(2) *Actual Loss in Value (Depreciation, Obsolescence, etc.).*

As in the case of the determination of current value there are deficiencies in the Utility's evidence of "actual loss in value" which under its methods of determination of a present value rate base must be considered. We agree with the respondent's determination on this aspect of the case, namely that the evidence in this respect is so deficient as to have little significance. In other words, the Utility again failed to carry the burden of proof.

For actual existing depreciation (actual loss of value) of the mass accounts such as poles, cross-arms, guys, conductors and distribution transformers, the Utility introduced evidence derived from a "random sample" method of inspection. There was no evidence introduced of the number of poles of various types in use, and it was admitted that the inspection was "in the aggregate, that is, without regard to type or class or height or any other characteristics of the poles," nor as to the type of preservative treatment. Mr. Davis testified that "random sampling has, as its objective, the securing of a small group out of a statical universe, such group possessing the same general characteristics as the

complete series of cases." It appears that upon the evidence adduced the respondent would have been justified in rejecting as unreliable the proof of "actual depreciation" of the poles merely on the failure of the Utility to prove that the samples inspected were representative of the whole in character. The only common characteristic apparent in the evidence is that all were poles! However it also appears that the method of rating poles was of questionable value. The Utility's evidence was of separate estimates of depreciation for butts, shanks and tops of poles, averaged to obtain an average depreciation factor. This, however, seems an unreliable method, for, as the respondent observed in its decision, poles exist as units and the butts, shanks and tops are not replaced separately.

As to transformers, field observations related only to the external features and as to oil seepage or leakage and appearance (excessive darkening of paint) of overheating. Upon this evidence and the testimony of Mr. Newman, who made the examinations which indicated he had no familiarity with depreciation factors of the inner parts of transformers, the proofs in this respect afford little of merit on a determination of actual loss of value.

The respondent further found that the company in its current value study made no actual allowance for physical deterioration of service connections despite the fact that many of the service connections had been installed decades ago. This conclusion is supported by the evidence.

The Utility's proof of physical deteriorations of steam generating facilities appears to be equally unreliable. On the obsolescence factor the respondent stated in its decision: "It is difficult to understand how an obsolescence deduction has been made by overvaluing old facilities and then reducing the value level only enough to be equivalent to the value level for more efficient new facilities." This observation was addressed principally to the 55 MW generating unit hereinbefore mentioned and its merit is obvious upon the evidence introduced. Compare *Market Street R. Co. v. Railroad Comm. of Cal., supra.*

The foregoing examples are characteristic of the evidence on "actual loss in value." In this respect the Utility failed to carry the. burden of proof. ,

*b. Historical Cost Rate Base*:

 The Utility contends that the respondent found a rate base on "net .original cost only plus working capital." The respondent argues that although disapproving the Utility's present value rate base as submitted, it recognized current value in reaching its finding as to rate base "for fully one-half of Appellant's gross investment in plant and facilities was made since World War II and such investment reflects the price levels prevailing in the postwar period." As has been demonstrated previously, the rate base determined by the respondent was based in part upon evidence introduced by the Utility for use in the computation of both a present value rate base and an historical cost rate base. A considerable portion, in excess of one-third of the plant in service proved by that evidence, was installed in the postwar years 1947, 1948 and 1949, and the Utility's own proofs were that "cost new of the property at present day price levels had fairly stabilized by mid-1948" and evidence of projected construction was considered by the respondent in connection with the base it ultimately found. The working capital component of the base so found is not attacked by the Utility since its own claims in that regard were found proved and included.

The Utility's first objection is that all evidence of present value was rejected by the respondent. This argument has no merit in view of the foregoing. As has been demonstrated in that connection, the Utility's argument that the criticism of the current value evidence is "arbitrary and unsupported by the record" is likewise without merit.

 Next the company contends that the respondent erred in disallowing the amount it sought to have included (in both of the rate bases upon which it introduced evidence) for certain projected plant additions. The Utility argues in this connection that any intelligent forecast of the future for the

purpose of establishing reasonable rate levels required the consideration of such items in the rate base. The respondent contends that the reasons stated in its decision for exclusion of this element from the rate base are fully justified by the record. The Utility also contends that the respondent erred in excluding from the rate base found the amounts claimed by the Utility for acquisition costs and for certain charges incurred for engineering and other overhead costs. The respondent found that the acquisition cost items had been written off by the company in 1944, and that even if a portion of such costs might be included in the rate base there was no proof adduced to show what proportion thereof related to the plant in service at the time of these proceedings. This is but another example of the Utility's failure to carry the burden of proof. The respondent found that the claim for engineering and overhead charges should be excluded from the rate base for the reason that it had been previously charged off or was otherwise contained in the value placed on the Utility's property. The evidence supports the respondent's conclusions on this item. Another Utility claim disallowed was $31,200 for interest during construction. This was excluded for the reason that such interest had not been actually charged. The Utility does not specifically assert error in this connection.

On the foregoing matters the respondent's determinations are supported by legal principles. A rate based upon property not used or useful in the rendition of the service for which the rates are imposed would lay upon the customers a burden greater than the reasonable worth of the accommodation supplied. *Atlantic City Sewerage Co. v. Board of Public Utility Commissioners, supra* (128 *N. J. L.* at *p.* 366). The fair value to be determined is that of the property *at the time of its employment for the convenience of the public* and the "honest and intelligent forecast of probable future values" expressed in the decisions of our courts relates to the value of that property *in use,* and not to contemplated additions to the property. See *Public Service Coordinated Transport v.*

*State, supra* (at 5 *N. J. p.* 217); *Atlantic City Sewerage Co. v. Board of Public Utility Commissioners, supra* (128 *N. J. L.,* at *p.* 366). The respondent recognized the company's claim of estimated costs of additions for 1950 but found from the evidence that the actual additions to plant in service during 1950 were more than $1,000,000 short of the company's forecast. It also found that there was no proof that the projected additions for 1951 and subsequent years would be constructed, and that the testimony of company witnesses proved that the additions contemplated were designed for future service expansion. The record supports these conclusions and we are unable to declare that the respondent's action was arbitrary in this respect. If experience in 1951 and subsequent years should demonstrate that plant additions are constructed or will be put in service, then the Utility has the right to file new schedules to reflect the changed conditions. As was said by Mr. Justice Heher in the *Atlantic City Sewerage Co.* case, *supra* (128 *N. J. L.,* at *p.* 367), "There is in the continuing supervisory power of the administrative agency a wholly adequate remedy for the correction of inequities and a means of adjustment to shifting circumstances."

The Utility contends that the respondent's determination is based solely on original cost. If this were true, and to a considerable extent it is not under the circumstances of this case, as above shown, the fault lies solely in the failure of the Utility to carry the burden of proof imposed upon it by law.

Without proceeding to a detailed analysis of the evidence, the record discloses that the original cost exhibits were determined from an original cost study completed by the Utility in February, 1944, following a costing (unification of annual costs actual or estimated for each year from 1915 through 1937, in which all available records were searched and analyzed) of a detailed physical inventory of its plant and properties as of December 31, 1938, and annual compilations of subsequent additions, retirements and transfers.

These original cost reports of February, 1944, had been checked and verified by staff members of the respondent by examination of the books of account of the company and other basic data. From 1944 through 1949, during which time the Rate Adjustment Plan hereinbefore adverted to was in operation, the inventory and cost values so adopted in 1944 were annually kept up to date, checked in the field from time to time as to correctness of inventory, and all data was annually checked and reviewed by respondent's staff members. The Utility does not contend that the historical cost values are improperly derived, but on the contrary grounds both its own submitted rate bases thereon, and the evidence supports the respondent's determination on the results. Thus on its own arguments the Utility's gross historical cost rate base and the rate base determined by the respondent are substantially at variance only in those respects where the Utility failed to prove its claimed allowances, discussed *ante*. The record in this case contains sufficient or substantial competent and relevant evidence in this respect, and the principal issue is the question whether the respondent properly excluded from the rate base the evidence of current value of older property. This has been discussed above, and we must reiterate our conclusion that, based on the evidence adduced, the proofs do not support a rate base greater in amount than that determined by the respondent, namely $33,500,000.

## II. INCOME AND EXPENSE

It is settled in this State that it is equally as important in a proceeding of this nature to determine the reasonableness of the items of expense and income to be allowed in computing the operating and net income of the public utility as it is to determine the rate base to which this net income is applied in the computation of the rate of return. *Public Service Coordinated Transport v. State, supra* (5 N. J. at p. 222).

. The Utility contends that the respondent's adjustments of revenues and expenses in determining the Utility's

operating income are illegal and not supported by the evidence. The respondent argues that the Utility failed to carry the burden of proof. That the burden of proof is upon the Utility is settled. *R. S.* 48:2–21*d, supra; Public Service Coordinated Transport v. State, supra* (5 *N. J.* at *p.* 222). Compare *Atlantic City Sewerage Co. v. Bd. of Public Utility Commissioners, supra* (128 *N. J. L.* at *pp.* 370–371).

The decision of the respondent makes various adjustments in expense and revenue items purporting to reflect a normal year under prevailing economic conditions. The Utility submitted forecasts of revenues and expenses in which it gave effect to certain items on a normalized basis and later introduced evidence of the actual experience for the year 1950. The purpose of normalizing adjustments is to determine a normal level of net income in order to reasonably forecast income so that rates established will be fair to both the public utility and to the public, during the period for which the rates are designed to be effective. The respondent is not under a duty to indulge in speculation as to such matters, however, for there is in its continuing supervisory power, as hereinbefore stated, a wholly adequate remedy for adjustment to shifting circumstances. Compare *Atlantic City Sewerage Co. v. Board of Public Utility Commissioners, supra* (128 *N. J. L.,* at *pp.* 367, 369 and 370–371). Further although the respondent is not bound by technical rules of evidence (see *R. S.* 48:2–32) there must be sufficient or substantial competent and relevant evidence in the record to support the reasonableness of these items since a court is of necessity restricted upon a review of the rates fixed by the respondent to a consideration of the record before it, *Public Service Coordinated Transport v. State, supra* (5 *N. J.* at *p.* 223); *Central R. Co. of N. J. v. Dept. of Public Utilities, supra* (7 *N. J.* at *p.* 260). We are of course authorized, particularly where certification (as in this case) has been allowed prior to hearing of the appeal under *Rule* 3:81–8 in the Superior Court, Appellate Division, and we thereupon assume the duties of that court (see *Central R. Co. of N. J. v.*

*Dept. of Public Utilities, supra, 7 N. J.* at *pp.* 258–259), *on application on notice of motion supported by affidavit* to grant leave to present additional evidence on the issues of the case if it appears that the additional evidence is material *and that there were good reasons for failure* to present it in the proceedings before the agency. *Rule* 3:81–9. Although this rule was not invoked in this case, it was suggested to the court by the Utility at the oral argument that 1951 actual operating results showed so great a variance with the net income forecast which entered into the respondent's determination of reasonableness of the existing rates for the service rendered by the Utility as to indicate that the forecast was arbitrarily reached and in this connection the Utility indicated its belief that the 1951 actual experience should be received in evidence by this court. Such evidence naturally was not available to the respondent but it had before it the operating results for that period in 1951 preceding its determination. There is not only no support in the evidence considered by the respondent to support the Utility's attack on the income forecast, but to the contrary the early 1951 actual experience which was considered by the respondent verifies that forecast. There being sufficient or substantial competent and relevant evidence in the record to support the respondent's determination in this respect, the validity of its decision and order must, under the foregoing authorities and *Rule* 3:81–9 be gauged thereby. Where by reason of circumstances beyond the control of the Utility and unforeseeable at the time of the rate order it becomes apparent that the existing rates are insufficient to provide a fair rate of return, and rates reasonable both to the public utility and the public, the remedy is not by way of invalidation of the past order on the basis of the subsequent events introduced in evidence before the appellate court, but by way of filing new schedules of rates in accordance with the statutory requirements.

With these principles in mind, let us examine the case presented by the Utility on this appeal. In the first place it

admits the validity of all the determinations and normalizing adjustments made by the respondent in the income and expense category except two: federal income tax allowance and normalization of interchange income (and expense). To this extent we find sufficient or substantial competent and relevant evidence in the record to support the respondent's decision and order.

(a) *Federal Income Tax Allowance*:

The Utility objects to the respondent's adjustment of its federal income tax savings, which result from filing a consolidated return (as noted in the historical prologue contained in this opinion, the Utility is a subsidiary of General Public Utilities Corporation). The respondent allowed the Utility only 50 per cent of the amount it claimed in this respect on the ground that "it seems equitable to allocate 50 per cent of such savings to customers." The Utility contends that there is no evidence upon which to base any percentage "and the principle applied is contrary to Law" for the reason that customers have no equity in the funds of the company. See *Board of P. U. C. v. New York Telephone Co.*, 271 *U. S.* 23, 31, 46 *S. Ct.* 363, 70 *L. Ed.* 808, 813 (1926). With this we agree, but the Utility is allowed a deduction from gross income for *actual* operating expenses only (or actual normalized operating expenses), and not for hypothetical expenses which did not and foreseeably will not occur. Thus it is entitled to an allowance for actual taxes and not for higher taxes that it would pay if it filed on a different basis. Compare *Arkansas-Lousiana Gas Co. v. Texarkana*, 17 *F. Supp.* 447, 464 (*D. C. W. D. Ark.* 1936), affirmed 96 *F. 2d* 179 (8 *Cir.*, 1938), *certiorari* denied 305 *U. S.* 606, 59 *S. Ct.* 66, 83 *L. Ed.* 385 (1938); see also 97 *F. 2d* 5 (5 *Cir.*, 1938), reversed in part on other grounds, 306 *U. S.* 188, 59 *S. Ct.* 448, 83 *L. Ed.* 598 (1939). This results in a conclusion that the respondent's allowance to the Utility of even 50 per cent of the difference between actual and hypothetical taxes was in error. However, in view of the

rising tax level now being experienced and the apparent satisfaction of the public with the existing rates of this public utility, and the fairness of the rate of return under the existing rates (hereinafter to be discussed) we find no reason in this case for reversal of the order of the respondent or reduction of the existing rates for the service rendered by the Utility.

*(b) Normalization of Interchange Income*:

There is little judicial expression to be found among the available authorities upon a definition of "normalization." We find analogous terms, however. "Normal" or "natural" flow of a stream has been defined as that flow unaffected by artificial conditions. *Adirondack Power & Light Corporation v. City of Little Falls,* 148 *Misc.* 191, 265 *N. Y. S.* 567 (*Sup. Ct.* 1930). "Normally" as used in a claim for a patent relating to a tripper machine was defined in relation to a tripper mechanism to mean action not caused by another instrumentality. *Groth v. International Postal Supply Co.,* 61 *F.* 284, 288, 9 *C. C. A.* 507 (2 *Cir.,* 1894). "Normal" described those forces which operate habitually, periodically or with a certain degree of frequency. *Restatement, Torts, Sec.* 302, *comment d.*

The Utility asserts that in this case the major issue is the complete disallowance by the respondent of its contention that in calculating net operating income, interchange income of recent experience should be normalized. The result of such normalization on the basis submitted by the Utility would be to increase its allowed operating expenses by $720,000. The respondent argues that the Utility failed to carry its burden of proof as to the reasonableness of this element of the case, and that the respondent in its decision capably demonstrated this failure. With this we agree. As is indicated by the analogous situations briefly adverted to, *ante,* "normalization" of an income or expense item is warranted only where there exist in it periodic characteristics, that is, the item must occur with a certain degree of frequency.

The power group structure of the interconnected companies (principally the members of the "GPU power group" and the "Pennsylvania-New Jersey interconnection") has been recited in the recitation of historical facts earlier in this opinion. Mr. Rankin, principal witness for the Utility on the interchange subject, testified clearly and at length. It appears that at the time of these proceedings he was vice-president of the Metropolitan Edison Company (one of the subsidiaries of the General Public Utilities Corporation, see historical recital, *ante*) which is one of the interconnected utilities of the GPU power group. He testified that the load scheduling and dispatching of the interconnected companies was under his general supervision; that the interconnected transmission facilities of the GPU power group were tied in directly or indirectly with Public Service Electric and Gas Company of New Jersey through which company the GPU power group participated in the Pennsylvania-New Jersey interconnection; that the purpose of these interconnections was to provide maximum economies through contracts for interchange of economy energy and pooling of reserve capacity and emergency back-up; that the participating companies receive material benefits from this interconnection of facilities "by reason of the coordinated operation, centralized dispatching and general treatment of the GPU power group virtually as a single entity"; that one of the purposes was "to provide a margin above the normal operating reserve for system growth between each successive increment of generating capacity added to the system" and to afford a desirable degree of flexibility in producing dependable power supply; that "the basic principle under which the GPU power group operates is to distribute equally among its member companies all savings generated by each two or three-way transaction." He further testified that the GPU power group Operating Committee together with a representative of the Northern Pennsylvania Power Company (not then interconnected) as a system planning group was "responsible for general planning in connection with the installation of additional generating

capacity and interconnections," and that a load scheduling and system dispatching organization, located at Reading, Pennsylvania, had been created which worked under the direct supervision of a supervisor of costs and schedules who in turn was directly responsible to the aforesaid operating committee; that the installation of equipment (at any point in the power system) will affect the general level of generation costs, and immediately upon the installation of a new unit there will develop an excess of capacity on the member company's specific system "which, if plant additions of the group are systematically planned, can be sold to other members of the group. This situation will generally be followed by a period of approximate balance * . * *" and then a period of net purchases of interchange energy. Later in the proceedings Mr. Rankin testified that the cost level of the entire group determines the interchange and that any change in capacity or addition in the group will affect it. One such factor he adverted to was the construction of a new Titus station for Metropolitan Edison Company expected to be placed in service in 1951. Another factor indicated in his testimony was the introduction into the interconnected system of Penelec (Pennsylvania Electric Company) in July, 1950, as to which he admitted no study had been made relative to the effect of that step on the level of interchange transactions.

In addition to the foregoing, Mr. Rankin testified that the Utility's load factor is apt to improve, due in part to existing emergent conditions. Mr. Davis testified that kilowatt hour sales of the Utility for 1951 were estimated to show ten per cent increase, and for 1952 a seven per cent increase. Mr. Liepe, manager of rates for the Utility, testified on one of the interchange items that estimates of revenue had been based on an old contract rate which was subject of agreements between the Utility and Metropolitan Edison Company, and to reflect the probable effect of the proposed method of billing the normalizing adjustment had been determined.

The respondent, in the decision and order appealed from, denied the normalization of interchange income as sought by the Utility for various reasons. One of these was that the experts' estimates were so far at variance with actual experience that their evidence was of little value. The evidence in the record supports this conclusion. Another reason was that Mr. Rankin's estimates were based upon estimates made by individuals in the various interconnected companies who were not produced as witnesses. To this reason the Utility interposes the argument that the respondent is not bound by technical rules of evidence under *R. S.* 48:2–32. While this is true, as we have stated, *ante,* the burden of proof is on the Utility and the respondent's findings must be supported by sufficient or substantial competent and relevant evidence. We find nothing in the record to indicate that the respondent's action in giving little weight to Mr. Rankin's estimates was either arbitrary or erroneous. Finally the respondent concluded (on this phase of the case) that the so-called normal situation assumed by the company witness did not exist as an actual fact and was not likely to be experienced where as here a company's production operations are not isolated but are governed by conditions prevailing from time to time in a power pool. The respondent in its decision observed: "In short, the company is seeking to adjust experienced costs to a purely hypothetical norm." Rise and fall in interchange income may be governed by conditions created by a utility and its interconnected companies, and although these conditions may be the product of good business practices, they may create a lack of cyclic characteristics in the interchange income which deprive it of normalization status. Further there is sufficient evidence in the record from which it may be inferred that local service needs are expanding at a rate that justifies the net income forecast involved in the determination of the board. We find that the evidence in the record justified the respondent's conclusions resulting in its disallowance of the Utility's claim for a normalizing adjustment of interchange.

The respondent's decision and order being supported by sufficient or substantial competent and relevant evidence on the expense-income phase, and the Utility having failed to prove entitlement to the claims on which it desired additional allowance, we conclude that it was not invalid or unreasonable in this respect.

### III — RATE OF RETURN

The respondent in the decision and order appealed from reached a determination that after adjustment of income and operating expenses, net income applied to the rate base found by it to represent the fair value of the Utility's property, produced an equivalent rate of return of 6.52 per cent. In its conclusion it found that it was not necessary under the circumstances of this case to make a specific finding as to fair rate of return because the actual rate of return (6.52 per cent) *ante,* lay within reasonable indicia as to the range of fair rate of return.

The Utility's principal charge of error in the respondent's determination is that the respondent failed to determine a precise minimum percentage of fair rate of return. The respondent argues that its decision is reasonable since it leaves the Utility with earnings sufficient to pay the charges on senior capital such as bonds and preferred stock, as well as return to common stockholders which compares favorably with that which investors are expecting from investments of similar character and risk, and in addition a substantial balance remains to be carried over to surplus account.

There was considerable testimony and other evidence introduced by the Utility upon this phase of the case. Much of it was based upon a hypothetical value to be accorded the Utility's common stock (all of which is owned by General Public Utilities Corporation). This value was derived from a comparison of the market values of common stock of other public utility companies. Although there may be instances in which such a method of valuation may be of substantial

merit it is not conclusive and under the circumstances of this case should be accorded little weight. However, even on that basis, the Utility's experts testified that a fair rate of return on the company's rate base, to provide a fair rate of return to equity capital, would be 6.5 per cent on a properly computed historical cost rate base (and 5.5 per cent on a properly computed present value rate base). Also it was admitted by the Utility during the argument before this court that the return actually available to common equity capital at adjusted book value under present rates for the Utility's service, is 14.0 per cent under the respondent's order, and would be 7.7 per cent if all adjustments proposed by the company had been allowed. While we do not hold that book or adjusted book value of stock constitutes an infallible barometer of market value, we do find sufficient evidence in the record to demand a substantial deviation therefrom. In any event, we are persuaded that the rate of return found (at 6.52 per cent) by relating the proper adjusted net income to the rate base in the present case is within the range of reasonableness, the zone between the lowest rate not confiscatory and the highest rate fair to the public. *Public Service Coodinated Transport v. State, supra* (5 *N. J.* at *p.* 225). Compare *Michigan Bell Tel. Co. v. Michigan Public Service Comm.*, 332 *Mich.* 7, 50 *N. W.* 2d 826, 838–839 (*Mich. Sup. Ct.* 1952).

In addition the evidence in this case shows that the Utility's preferred stock was readily marketable with a dividend rate of slightly over 4 per cent, and its coupon bonds were readily marketable at 2⅞ per cent. Although these items constitute but a minute fraction of the whole evidence, they are indicia of the general circumstances surrounding this case, and a guide upon which to evaluate the entire evidence adduced. "When bonds and preferred stocks of well seasoned companies can be floated at low rates, the allowance of an overall rate return of a modest percentage will bring handsome yields to the common stock. Certainly the yields of the equity issues must be larger than that for the underlying securities. In

this instance the Utility operates in a stable community, accustomed to the use of electricity and close to the capital markets, with funds readily available for secure investment. Long operation and adequate records make forecasts of net operating revenues fairly certain. Under such circumstances a six per cent return after all allowable charges cannot be confiscatory." This quotation from Mr. Justice Reed's opinion in *Driscoll v. Edison Light & P. Co.*, 307 *U. S.* 104, 120, 59 *S. Ct.* 715, 83 *L. Ed.* 1134, 1145 (1939), seems peculiarly apposite here. We find that the return realized by the Utility under the circumstances of this case is not only not confiscatory but also is reasonable. That rate, upon evidence, is 6.52 per cent. We do not find that the rate of return must remain constant at that percentage, however. If circumstances warrant the rate may be adjusted in a proper proceeding before the respondent to reflect changed circumstances.

### IV — CONSTITUTIONAL RIGHTS

 The Utility contends that the decision and order of the board constitute taking of property without just compensation and without due process of law, in violation of *Article I, pars.* 1, 20, *N. J. Const.* 1947 and the 14th Amendment to the Constitution of the United States. This contention is meritorious only where the rate base determination, allowances of income and operating expense, and finding of rate of return are illegally arrived at or are not found. Since all these elements of the decision and order appealed from are present and valid, no constitutional issue exists in this case. If experience in 1951 and later years requires a change from the existing rates the Utility must avail itself of the means afforded by the statute to effectuate the same.

### CONCLUSION

For the reasons stated the decision and order of the Board of Public Utility Commissioners, Department of Public

Utilities, State of New Jersey, denying the increase in rates sought by New Jersey Power & Light Company, is hereby affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN —6.

*For reversal*—Justice HEHER—1.