CRABTREE, J.T.C.
These are local property tax cases wherein plaintiff seeks review of the 1984 and 1985 assessments on its reservoir and property adjacent thereto lying within defendant taxing district. The case involves 11 separately assessed parcels. The Block and Lot designations and the assessments (which are the same for both years) are all shown on Schedule “A” attached hereto and incorporated herein by this reference.
Plaintiffs complaint for 1984 constitutes an appeal from a Bergen County Board of Taxation judgment affirming the assessments, while plaintiffs complaint for 1985 is a direct appeal pursuant to N.J.S.A. 54:3-21.
At issue are the true value of the subject property and, with respect to 1985, the applicability of N.J.S.A. 54:51A-6 (chapter 123).
Plaintiff is a regulated private water utility supplying water service to more than 800,000 customers in northern New Jersey. The subject property is a reservoir for part of plaintiffs water supply, together with upland acreage. Approximately 153 acres are involved, of which about 97 acres are under water. The balance of the acreage consists of an island in the reservoir, an embankment and marshland adjoining the submerged land, and uplands. All the subject property is included in plaintiffs rate base as used and useful property devoted to public service. Two lots were withdrawn at the outset of the *548 trial. These were among the parcels to be conveyed to a related corporation pursuant to an order of the New Jersey Board of Public Utilities (BPU). The BPU order followed the submission of a detailed engineering study which contained recommendations concerning the lands owned by plaintiff which should remain in plaintiff’s rate base as property used and useful in providing water service to plaintiff’s customers. The two parcels withdrawn at the trial represented substantially all the land which the study found were not required for water supply purposes.
The engineering study commissioned by plaintiff at the direction of the BPU indicated that the remaining useful life of the reservoir was approximately 180 years. The credible evidence in this case indicates that the upland acreage, along with the island and embankment and marshlands referred to below, are needed to protect plaintiff’s water supply in the reservoir.
Plaintiff’s expert estimated the true value of the subject property on October 1, 1983 to be $1,402,850. In developing this estimate he relied exclusively upon the market data approach to value. He concluded, on the basis of his comparable sales, that the unit value of the residentially zoned uplands, before adjustments, was $75,000 an acre. He posited an unadjusted value for the commercially zoned uplands of $150,000 an acre; and he estimated the value of the under water land at $500 an acre. While the expert made adjustments for size, topography, location and zoning, his principal adjustment pertained to the regulatory constraints imposed by law upon the disposition of the subject property by plaintiff as a regulated public utility. He posited a 50% downward adjustment for all lands which, he concluded, were necessary for the protection of the reservoir. These protective parcels represent all the lands included in this case except for 1.96 acres, a part of Block 2301, Lot 1, which is residentially zoned upland. The expert concluded that this property was “outside the parameters,” i.e., it was not required for the protection of plaintiff’s water supply; and he made only a 30% adjustment for shape and fill requirements.
*549 Block 2301, Lot 1, the largest assessed lot, also includes 3.776 acres constituting an island in the reservoir, 26.18 acres of embankment land, 4.55 acres of marshland and 96.42 acres of land underlying the reservoir. The expert applied the 50% adjustment for regulatory constraints to all these parcels. In addition he adjusted the island 45% for utility, the embankment land 30% for size and topography, the marshland 45% for topography and utility, and the under water acreage 50% for size, utility and topography. As the adjustments to the underwater land equal 100% of his value estimate the expert assigned a nominal value of $500 an acre to the submerged land.
The 2.33 acres of commercially zoned upland is, in the expert’s judgment, also to be considered as protective land, i.e., it is necessary for the protection of the reservoir. He therefore made the same 50% adjustment to his value estimate of $150,-000 an acre. He also adjusted for location, fill requirements, easements and topography. His unadjusted value estimate of $150,000 an acre was supported by five allegedly comparable sales of commercial property located in Hillsdale, Washington Township (2), Hackensack and Paramus. The critical data on these sales is best shown in tabular form as follows:
Municipality * ale Date Acreage Price Price/acre
Hillsdale 11/21/83 1.753 $330,000 $ 188,248
Washington Tp. 11/15/78 5.3 275.000 51,885
Hackensack 6/83 1.87 300.000 160,085
Washington Tp. 8/18/81 9.74 586.000 60,162
Paramus 7/81 1.05 175.000 166,667
* All the municipalities are in Bergen County
The expert concluded that the highest and best use of the subject property was its continued use as a reservoir. His 50% adjustment for the water supply was predicated upon two related factors: none of plaintiff’s property could be sold without BPU approval and plaintiff, as a regulated public utility, was not permitted to sell its property for any amount in excess *550 of the original cost to plaintiff, which, as plaintiff acquired the property in the early years of this century, was very low.
In estimating the true value of the subject property on October 1, 1984, for tax year 1985, plaintiffs expert simply increased his October 1, 1983 valuation 10% except for the submerged land which remained at $500 per acre.
Defendant’s expert estimated the true value of the subject to be $8,049,000, but this included the lots withdrawn at trial as well as acreage which had not been assessed. Notwithstanding these disparities the court can evaluate the unit values estimated by defendant’s expert for the several categories of land.
Defendant’s expert estimated the value of the residentially zoned lands at $75,000 an acre; he valued the commercially zoned lands at $185,000 an acre and the island and submerged lands at $18,750 an acre. These are his estimates for October 1, 1983. He increased all the unit value estimates 10% for October 1, 1984.
The defendant’s expert’s unadjusted value estimate for the residentially zoned land, including the embankment and marshland adjoining the reservoir, is in accord with the unadjusted value posited by plaintiff’s expert. The experts diverge, however, on the value of the commercially zoned uplands. Defendant’s expert, as indicated, posits an unadjusted unit value of $185,000. He supported his conclusion with five allegedly comparable sales of commercial property, all in defendant municipality. The critical data on those sales is best shown in tabular form as follows:
Sale/date Acreage Price Price/acre
6/25/82 4.09 $ 586,500 $ 143,328
8/12/81 7.64 1.295.000 169,392
3/21/83 20.00 4.100.000 205,000
4/21/83 3.46 415.000 119,666
5/9/84 3.62 675.000 186,464
The unadjusted weighted average sales price of these comparables is $182,208. After minor adjustments for time, the weighted average is $190,814.
*551 The experts also disagree on the valuation of the submerged land and the island. Plaintiff’s expert, as stated above, valued the island at $3,750 an acre and the under water land at the nominal value of $500 an acre. Defendant’s expert, on the other hand, valued the island and submerged land at 25% of the value posited for residentially zoned land. He supported this conclusion with a sophisticated comparison of sales of underwater land in Jefferson and Roxbury Townships with sales of upland property in those communities. The ratio of the weighted average, adjusted for time, of the underwater sales to upland sales in Jefferson Township was 25%; in Roxbury Township the ratio was 27%.
Defendant’s expert concluded that the highest and best use of the submerged land and the island was a continuation of use as a reservoir; he found that the highest and best use of the balance of the property was for development in accordance with applicable zoning regulations. He also concluded that 49.246 acres of residentially zoned upland and the entire 2.27 acres of commercially zoned upland were protective lands, ie., they were necessary for the preservation of the quality of the water in the reservoir.
Defendant’s expert applied a 25% discount to his valuation of the protective lands in recognition of the BPU’s control over the disposition of those lands. He made no other adjustments to his value estimates.
The first step in the valuation process is to determine the highest and best use of the land. As we said in West Orange v. Goldman's Estate, 2 N.J.Tax 582 (Tax Ct.1981):
The fitness and availability of property for particular uses must be considered in arriving at taxable value, rather than the fact of actual use ... Determination of highest and best use thus requires analysis of the likelihood of profitable alternate uses ... viewed as of the critical date, ie., in tax cases, the assessing date ... Such alternate uses, however, must not be “remote, speculative or conjectural" ... To put it differently, remote uses are irrelevant and property valuation should have some relationship to reality, [Id. at 587; citations omitted]
In Hackensack Water Co. v. Old Tappan Boro., 77 N.J. 208, 390 A.2d 122 (1978) the Court, in addressing the valuation of *552 reservoir lands, declared that valuation should bear some relationship to reality, and that remote uses were irrelevant. In Hackensack Water Co. v. Haworth Boro., 2 N.J. Tax 303, 178 N.J.Super. 251, 428 A.2d 934 (App.Div.1981), the court reversed the lower court’s holding that a reservoir should be valued as a lake, with the upland property valued as a residential lake community. The Appellate Division found that such residential use was too remote and thus irrelevant.
In this case the engineering study commissioned by plaintiff at the BPU’s direction indicated the estimated remaining useful life of the reservoir to be 180 years, which is to say, for all practical purposes, in perpetuity. The BPU, following plaintiff’s 1983 rate case, directed plaintiff to submit an engineering study of all lands owned by plaintiff, including lands in New York state, in order to identify those properties which should remain in plaintiff’s rate base for rate-making purposes and to arrange for disposition of those lands which did not contribute to the preservation of plaintiff’s water supply nor to providing water service to plaintiff’s customers. To put it differently, the purpose of the study was to identify those properties which were “used and useful in the public service” and which therefore should remain in plaintiff’s rate base for rate-making purposes. In re New Jersey Power & Light Co., 9 N.J. 498, 509, 89 A.2d 26 (1952). The engineering study concluded that all but a few parcels in defendant taxing district belonged in plaintiff’s rate base as used and useful property in the public service, specifically, protection and maintenance of the water supply. The only exceptions were Block 1108, Lot 3 comprising 23.5 acres, Block 2105, Lot 1, containing 3.14 acres and portions of Block 2301, Lot 1, totalling approximately four acres. Block 1108, Lot 3, and Block 2105, Lot 1 were withdrawn at the outset of the trial. The BPU accepted the recommendations of the engineering study and in a Decision and Order of December 17, 1984 (D & O) directed plaintiff to convey 717.91 acres of “real property no longer used or useful for the provision of utility service” to a related non-utility corporation. The D & O also provided for an appraisal of the property to be conveyed and *553 directed that the gain, i.e., the excess of appraised value over the sum of original cost and hypothetical closing expenses, be shared equally between plaintiffs ratepayers and the stockholder’s of plaintiff’s parent corporation.
. Thus, the property remaining in rate base following the BPU Decision and Order of December 17, 1984 was necessarily found to be used and useful in the provision of water service to plaintiff’s customers; and this remaining property includes all the lots in issue here. In view of the foregoing I find, with one exception, that the highest and best use of all the property involved in this case is a continuation of its use as a reservoir which, for this purpose, includes the embankment, marshland, island and uplands, all of which are reasonably required for the protection and maintenance of the reservoir. The exception is a 1.96 acre tract, a part of Block 2301, Lot 1, which the engineering study found to be outside the protective parameters. I find the highest and best of that solitary parcel to be residential in accordance with applicable zoning regulations.
The relevant statute is N.J.S.A. 54:30A-52, which directs that all real estate owned by a private utility “shall be assessed and taxed at local rates in the manner provided by law for the taxation of similar property owned by other corporations or individuals.” The term “real estate” is defined in N.J.S.A. 54:30A-50(b) to exclude, inter alia, dams and reservoirs; only the underlying land is subject to assessment and taxation under the statute. See Hackensack Water Co. v. Haworth Boro., supra.
In valuing the land pursuant to N.J.S.A. 54:30A-52 the improvements such as the dam and structures related thereto, and the cost of removing the water, will not result in negative adjustments because of the highest and best use of the property. Newark v. Cedar Grove Tp., 7 N.J. Tax 66 (Tax Ct.1984). The sole issue is the true value of the raw, undeveloped land. In re Appeal of East Orange, 103 N.J.Super. 109, 246 A.2d 722 (App.Div.1968).
*554 The New Jersey Supreme Court, in a case involving watershed lands owned by a municipality, construed a statute similar to N.J.S.A. 54:30A-52 and concluded that watershed and reservoir lands must be assessed pursuant to the test embodied in N.J.S.A. 54:4-23, viz, what the property would sell for at a fair and bona fide sale by private contract on October 1 of the pretax year. Newark v. West Milford Tp., 9 N.J. 295, 88 A.2d 211 (1952). The Court there stated:
It is not possible to measure with mathematical precision the value of the lands here assessed because comparable property of private water companies are rarely the subject of sale and their assessment is based upon additional factors not here present ... The lands here in question cannot be sold by private contract, and because of the vast acreage involved there are few if any comparable holdings in the hands of private persons. So it follows that the assessment of these lands cannot be fixed with any degree of mathematical exactness but must be fixed by a reasonable and equitable comparison with the true value of smaller comparable holdings of private persons. A reasonably approximate and comparable true value based upon the same principles of taxation applicable to these holdings of private persons will be a compliance with the statutory direction. [Id. at 303, 88 A.2d 211]
. Both experts agree on the unit value of the residentially zoned lands. The experts also agree that some negative adjustment is appropriate to reflect regulatory constraints. Neither party disputes the principle that government regulation may have a significant impact on the valuation of real property for tax purposes. See Schwam v. Cedar Grove Tp., 9 N.J. Tax 406 (Tax Ct.1987). None of the property involved in this case may be sold without BPU approval. N.J.S.A. 48:3-7. Furthermore, as the court pointed out in Newark v. West Milford, supra, property of private water companies is rarely the subject of sale. The logical purchasers of plaintiff’s property would be one of the three large private water companies in New Jersey or perhaps a water utility in New York state located in Rock-land, West Chester or Duchess Counties. The purchase of smaller water systems by larger water utilities is not uncommon. See, e.g., Re Indianapolis Water Company, 75 PUR4th. 643 (Ind. Public Service Comm.1986). Plaintiff’s expert posits a 50% negative adjustment, while defendant’s expert finds 25% to be sufficient.
*555 The adjustment proposed by plaintiff’s expert is predicated on his view that property owned by a public utility can only be sold for its original cost, which, given plaintiff’s acquisition over 70 years ago, is a fraction of the property’s present value. The expert’s view is erroneous. If utility land is sold to a private party, i.e., a non-utility purchaser, regulatory approval of the sale presupposes the property is no longer needed in rate base. The profit from such a sale is properly credited to the shareholder surplus account. Pa. Gas and Water Company v. PUC, 72 Pa. Cmwlth. 331, 456 A.2d 1126 (Comm.Ct.1983); Re D.C. Transit System, 30 PUR3d 405 (D.C.Pub.Service Comm.1959). Indeed, the BPU’s Decision and Order of December 17, 1984 directs the conveyance of certain property at its appraised, i.e., fair market value to a non-utility transferee. The D & O is consistent with BPU regulations. See N.J.A.C. 14:1-6.10(a)(6)(7) (petition for approval of sale of real property must indicate whether proposed consideration represents fair market value of property to be conveyed).
If the entire reservoir and adjoining uplands were sold to another private water utility the selling price would likewise approximate the fair market value of the property and, while only the property’s original cost would be entered in the purchasers’ rate base, the excess of the sale price over that cost would be amortized “above the line”, i.e., treated as an allowable expense for rate-making purposes. This is known as an acquisition adjustment. Re Duke Power Co., 26 PUR4th (N.C. Public Service Commission 1978). The adjustment will be allowed provided the regulatory commission is satisfied that the purchaser’s customers will benefit from the acquisition. Re Interstate Power Company, 81 PUR4th. 471 (Iowa Utilities Board 1987); Re Indianapolis Water Company, supra.
Thus, plaintiff’s expert has not supported his 50% negative adjustment. The probative utility of an expert’s opinion depends entirely upon the facts and reasoning offered in support of it. Dworman v. Tinton Falls, 1 N.J. Tax 445 (Tax Ct.1980), *556 aff’d o.b. per curiam 3 N.J. Tax 1, 434 A.2d 1134 (App.Div. 1981), certif. den. 88 N.J. 495, 443 A.2d 709 (1981).
The 25% negative adjustment made by defendant’s expert is more persuasive. It comprehends the time required to consummate a sale of the reservoir and adjoining lands to another water utility, public or private, and BPU approval of the transaction. The adjustment is also large enough to comprehend the likelihood that the BPU would require the profit on the sale to be shared between plaintiff’s shareholder and its ratepayers.
The unadjusted unit value posited by defendant’s expert for the commercially zoned uplands is also more pursuasive than the value estimate profferred by plaintiff’s expert. The latter, in support of his estimate of $150,000 an acre, relies upon five sales of commercial/industrial and office properties. One of the five sales occurred in 1978 and is thus too remote to be probative; three of the remaining four sales sold for unit prices substantially greater than $150,000 and the remaining sale was for a low unit price of $60,162 an acre. Evidence of comparable sales is probative of value only where there is a substantial similarity so as to admit of reasonable comparison. Venino v. Carlstadt, 1 N.J. Tax 172 (Tax Ct.1980), aff’d per curiam 4 N.J. Tax 528 (App.Div.1981). I thus find that plaintiff's expert’s comparable sales of commercial/industrial property do not support his value estimate of $150,000 an acre. On the other hand, the five comparable sales proffered by defendant’s expert provide. persuasive support for his unadjusted value estimate of $185,000 an acre. All the sales involved land in Woodcliff Lake in reasonable proximity to the first assessing date. The arithmetic mean price of those sales was $164,770, while the weighted average was $182,208. After an adjustment for time the arithmetic mean was $175,177 and the weighted average was $190,814.
While a statistical averaging technique, such as the arithmetic mean utilized by defendant’s expert, is not probative with a mere handful of sales, I find that the combined weight of all five sales, which evidence comparability of the sales proper *557 ties to the subject in terms of time, location, size and zoning, provides persuasive support to the expert’s value estimate.
Accordingly, I find the unadjusted true value of the commercially zoned uplands to be $185,000 an acre on October 1, 1983. As these parcels are included among the protective lands, the value will be adjusted downward by 25% to reflect regulatory constraints upon the sale of the property.
As for the submerged lands and the island the adjustment made by defendant’s expert on the basis of sales of underwater land and upland in two townships in Morris County is persuasive as it is predicated on market action. I therefore find the unadjusted true value of the submerged lands and of the island to be $18,750 an acre, which is 25% of the unadjusted true value of the residentially zoned uplands, hereinabove found to be $75,000 an acre. Defendant’s expert, however, made no adjustment for regulatory constraints, which I find to be appropriate for the submerged lands and the island as well as for the uplands. Thus, the same 25% negative adjustment will be applied to the true value of the submerged lands and the island so that the true value thereof, adjusted for regulatory constraints, is $14,062 an acre ($18,750 x .75). In light of my finding of highest and best use the adjustments made by plaintiff’s expert for topography, location and the like are irrelevant, except for 1.96 acres which is among the properties the BPU ordered plaintiff to convey to a related non-utility corporation. As to that parcel plaintiff’s expert’s negative adjustment for shape and fill requirements of 30% is reasonable.
In view of the foregoing I find the true value of the subject property on October 1, 1983 and October 1, 1984 to be as shown on Schedule “B” attached and incorporated herein by this reference. The October 1, 1984 true values shown on Schedule “B” are 110% of the true values determined for October 1, 1983. Both experts agree on a 10% upward adjustment to reflect an increase in value from one year to the next.

*558
Chapter 123

Chapter 123 has no application to tax year 1984, a revaluation year. N.J.S.A. 54:51A-6(d). Thus, in the absence of an appeal to the county board or, in the case of a direct appeal, a complaint filed in this court by August 15 of the tax year by the taxing district, the latter is not entitled to an increase in its assessment no matter what the valuation proofs show. FMC Stores Co. v. Morris Plains Boro., 100 N.J. 418, 495 A.2d 1313 (1985). In this case however, defendant sought an increase in the subject assessments before the Bergen County Board but failed to file a complaint or counterclaim in this court seeking an increase for 1984. Defendant, in its brief, contended that the lands should be valued at the estimates profferred by its expert. I infer from this contention that defendant seeks an increase in the assessments consonant with those value estimates. FMC Stores involved direct appeals to the Tax Court pursuant to N.J.S.A. 54:3-21. No reported case has dealt with the precise issue raised in this proceeding, namely, the consequences of the taxing district’s failure to file a complaint or counterclaim in the Tax Court when an increase was sought before the county board and denied by that tribunal.
Filing of a counterclaim in Tax Court proceedings is governed by R. 8:4-3, which provides that the time for filing of all pleadings other than the complaint shall be as prescribed by R. 4:6-1. The latter rule states that a counterclaim must be served within 20 days after service of the summons and complaint. R. 4:6-1(c) provides that the time for filing an answer (including a counterclaim) may be enlarged by written consent of the parties by no more than 30 days. Extensions of time beyond that may only be granted on notice by court order and only for good cause shown. In the instant case, however, defendant simply failed to file either an answer or a counterclaim.
Cases in this court, as well as in the appellate tribunals of this State, have stressed the importance of complying with *559 statutes and rules in tax controversies. Thus, filing deadlines are strictly observed. Prospect Hill Apts. v. Flemington, 1 N.J. Tax 224, 411 A.2d 737 (Tax Ct.1979); and it is no defense that the taxpayer’s attorney was incorrectly advised by a county board officer as to compliance with the filing deadline. Mayfair Holding Corp. v. North Bergen Tp., 4 N.J. Tax 38 (Tax Ct.1982). The same strict rule applies to affirmative relief. Any party seeking such relief in this court must protect his rights by the filing of an appropriate pleading. Cherry Hill Tp. v. U.S. Life Ins. Co. of N.Y., 1 N.J. Tax 236, 243, 422 A.2d 810 (Tax Ct.1980), quoted with approval in FMC Stores Co. v. Morris Plains Boro., 195 N.J. Super. 373, 479 A.2d 435 (App. Div.1984), aff’d 100 N.J. 418, 495 A.2d 1313 (1985). Although FMC Stores dealt with statutory time limitations on direct appeals by a taxing district, the rationale of that decision applies to claims for relief in any forum. The governing statute in this case is N.J.S.A. 54:51A-1(a), which provides that appeals from county board judgments are governed by rules of court. Defendant, having sought increases in the assessments at the county board, was obliged to file for the same relief in this court, either through an original complaint or a counterclaim filed in accordance with R. 8:4-3 and R. 4:6-1. As the Supreme Court observed in FMC Stores: “... in dealing with the public, government must ‘turn square corners’ ... Its primary obligation is to comport itself with compunction and integrity, and in doing so government may have to forego the freedom of action that private citizens may employ in dealing with one another.” 100 N.J. at 426-427, 495 A.2d 1313.
As defendant filed no pleading seeking affirmative relief the judgment of the Bergen County Board of Taxation will be affirmed and the original assessments will not be increased for 1984.
Tax year 1985 is a different matter. Chapter 123 applies as 1985 is not a revaluation year. N.J.S.A. 54:51A-6 provides, pertinently:
a. Whenever the tax court is satisfied by the proofs that the ratio of the assessed valuation of the subject property to its true value exceeds the upper *560 limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property except as hereinafter provided.
b. If the average ratio is below the county percentage level and the ratio of the assessed value of the subject property to its true value exceeds the county percentage level, the tax court shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property.
The average ratio is that ratio promulgated by the Director, Division of Taxation pursuant to N.J.S.A. 54:1-35.1 (table of equalized valuations used for calculation and apportionment of school aid); the common level range is plus or minus 15% of the average ratio. N.J.S.A. 54:1-35a.
Application of N.J.S.A. 54:51A-6 is automatic; and, if warranted by the court’s finding of true value, an assessment may be increased pursuant to the statute whether or not a counterclaim has been filed seeking an increase. Weyerhaeuser Co. v. Closter Boro., 190 N.J.Super. 528, 464 A.2d 1156 (App.Div. 1983); Devonshire Development Assoc. v. Hackensack, 2 N.J. Tax 392, 446 A.2d 201 (Tax Ct.1981); Abe Schrader Corp. v. Secaucus, 8 N.J. Tax 390 (Tax Ct.1986). See FMC Stores Co. v. Morris Plains Boro., supra, 100 N.J. at 428-430, 495 A.2d 1313 (court distinguishes a municipality’s claim for increased assessment in year to which c. 123 applies).
The average ratio promulgated for defendant for tax year 1985 is 95.58%. The lower limit of the common level range is 83.79% and the upper limit is nominally 113.37% but the effective limit is 100%. N.J.S.A. 54:51A-6(b). See Abe Schrader Corp. v. Secaucus, supra.
Adjustments were not the same for all 11 parcels involved in this case. Some were subject to a 25% adjustment for regulatory constraints, while others were not; the underwater land was valued on a ratio method predicated upon the percentage relationship of sale prices of underwater land and upland, with an adjustment of 25% for regulatory controls. Finally, one parcel of upland was not subject to the 25% regulatory adjustment but allowance was made for physical characteristics.
Thus, the appropriate assessments will be determined by examining the ratio of assessment to true value for each *561 separately assessed lot. Chapter 123 will then be applied to increase the assessment, reduce it or let it stand, as the case may be.
Judgments will be entered in accordance with the assessments shown on the attached Schedule “C.”
SCHEDULE A
1984 and 1985 Assessments
Block/Lot Assessment Acreage
1201/6 $ 136,900 2.9
1202/4 87,400 1.6
2206/4 35,500 0.8
2301/1 1,481,000 132.88
2301/2 115,200 2.56
2301/3 43,900 1.17
2301/5 46,200 2.17
2303/1 ' 66,300 0.43
2406/2 135,000 0.83
2406/11 208,800 1.07
2501/12 47,700 1.26
$2,403,900
SCHEDULE B
True Value as of October 1, 1983 and October 1, 1984
Block/Lot Acreage Value per acre 10/1/83 true value 10/1/84 true value
1201/6 2.9 $ 56,250 $ 163,125 $ 179,438
1202/4 1.62 56.250 91,125 100,238
2206/4 0.8 56.250 45,000 49,500
2301/1 1.96 52,500 102,900 113,190
// it 3.776 14,062 53,100 58,410
(island) 26.18 56.250 1,472,625 1,619,887
(embankment) 4.55 56.250 255,938 291,532
(marshland) 96.42 14,062 1,355,860 l,49l'450
*562 BIock/Lot Acreage Value per acre 10/1/83 true value 10/1/84 true value
(submerged land)
2301/2 2.56 56.250 144,000 158,400
2301/3 1.17 56.250 65.812 72.393
2301/5 1.17 56.250 65.812 72.393
// // 1.00 14,062 14,062 15,470
(submerged)
2303/1 .043 138.750 59,663 65,629
2406/2 0.83 138.750 115,162 126,678
2406/11 1.07 138.750 148,463 163,507
2501/12 1.26 56.250 70,875 77,962
SCHEDULE C
Tax Court Judgment Figures
Block/Lot Original Assessment Tax Court Judgment
1984 1985
1201/6 $ 136,900 i 136,900 $ 175,890
1202/4 87,400 87,400 87,400
2206/4 35,500 35,500 48,800
2301/1 1,481,000 1,481,000 3,523,700
2301/2 115,200 115,200 156,150
2301/3 43,900 43,900 71,365
2301/5 46,200 46,200 86,515
2303/1 66,300 59,663 64,600
2406/2 135,000 115,162 124,880
2406/11 208,800 148,463 161,190
2501/12 47,700 47,700 75,850