**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0096-21

IN THE MATTER OF THE
PETITION OF NEW JERSEY-
AMERICAN WATER COMPANY,
INC. FOR APPROVAL OF
INCREASE TARIFF RATES AND
CHARGES FOR WATER AND
WASTEWATER SERVICE,
CHANGE IN DEPRECIATION
RATES AND OTHER TARIFF
MODIFICATIONS.

_____

Argued March 22, 2023 – Decided December 30, 2024

Before Judges Accurso, Firko and Natali.

On appeal from the New Jersey Board of Public
Utilities, Docket No. WR17090985.

James C. Meyer argued the cause for appellant New
Jersey-American Water Company, Inc. (Riker,
Danzig, Scherer, Hyland & Perretti, LLP, attorneys;
James C. Meyer, of counsel and on the briefs; Michael
S. Kettler, on the briefs).

Brandon C. Simmons, Deputy Attorney General,
argued the cause for respondent New Jersey Board of
Public Utilities (Matthew J. Platkin, Attorney General,

attorney; Donna Arons, Assistant Attorney General, of counsel; Brandon C. Simmons, on the brief).

Christine M. Juarez, Assistant Deputy Rate Counsel, argued the cause for respondent New Jersey Division of Rate Counsel (Brian O. Lipman, Director, attorney; Brian O. Lipman and Susan E. McClure, of counsel; Christine M. Juarez and Emily Smithman, on the brief).

The opinion of the court was delivered by

ACCURSO, P.J.A.D.

New Jersey-American Water Company, Inc. appeals from a final decision of the New Jersey Board of Public Utilities denying its request for acquisition adjustments to its rate base for its purchases of Shorelands Water Company and the Borough of Haddonfield's Water and Sewer System. American Water claims the Board "improperly imposed a new standard" that "the utility provide a formal 'commitment' or 'guarantee' never to build the avoided capital projects" it claimed provided the "tangible benefit" to existing ratepayers justifying the adjustments and failed to acknowledge the facts in the record establishing the benefits the acquisitions provided those ratepayers.

We disagree that the Board or the Administrative Law Judge, whose decision the Board adopted without modification, applied any standard other than the one the Board established in I/M/O Elizabethtown Water Co., 11

N.J.A.R. 303, 1984 WL 981081 (N.J.B.P.U. 1984), rev'd on other grounds, 205

N.J. Super. 528 (App. Div. 1985), aff'd as modified, 107 N.J. 440 (1987).

American Water's real quarrel is with the ALJ's fact-findings adopted by the

Board, which, because they have sufficient support in the record, are

conclusive on this appeal. See In re Pub. Serv. Elec. & Gas Co.'s Rate

Unbundling, 167 N.J. 377, 385 (2001); N.J.S.A. 48:2-46 (a reviewing court

may set aside an order of the BPU only "when it clearly appears that there was

no evidence before the board to support the same reasonably").

The law governing American Water's application is straightforward.

The only issue before the Administrative Law Judge was whether American

Water would be permitted to recognize proposed acquisition adjustments for

Shorelands and Haddonfield in its rate base.[1]  N.J.S.A. 48:2-21(b) charges the

Board with the obligation to "fix just and reasonable" rates.  That ordinarily

involves a three-step process in which "the utility must prove:  (1) the value of

its property or the rate base, (2) the amount of its expenses, including

operations, income taxes, and depreciation, and (3) a fair rate of return to

---

[1]  The acquisition adjustments were the only issues remaining in the Office of
Administrative Law following a settlement by American Water, Board Staff,
Rate Counsel, and intervenors of the Company's 2017 rate petition, agreeing
the Company's base rate revenues should increase by $40 million, thereby
reducing approved interim rates by $35 million.

investors." In re Petition of N.J. Am. Water Co., 169 N.J. 181, 188 (2001) (quoting In re Petition of Pub. Serv. Elec. & Gas, 304 N.J. Super. 247, 265 (App. Div. 1997)). Here, however, because the only issue was the acquisition adjustments, the Company was required to establish only the first ratemaking factor, that is, its rate base, defined as "the fair value of the property of the public utility that is used and useful in the public service at the time of its employment." In re New Jersey Power & Light Co., 9 N.J. 498, 509 (1952).

When a utility sells an asset to another utility, "only the property's original cost [less depreciation] is entered into the purchasers' rate base," Hackensack Water Co. v. Woodcliff Lake Bor., 9 N.J. Tax 545, 555 (1988), the original cost being "the cost of the property to the first person who devoted the property to utility service," Hackensack Water Co. v. Bor. of Old Tappan, 77 N.J. 208, 216 n.4 (1978). An acquisition adjustment, allows "the excess of the sale price over that cost" to be "treated as an allowable expense for rate-making purposes." Hackensack Water Co., 9 N.J. Tax at 555. BPU will generally not recognize an acquisition adjustment unless the utility has "proven that a specific and tangible benefit inured to ratepayers from the acquisition," In re S. Jersey Gas Co., BPU 843-184, GR8508858 (Bd. of Pub.

Utils. Dec. 30, 1985), in accordance with the policy it adopted in 1984 in Elizabethtown, 11 N.J.A.R. at 357.

In Elizabethtown, the Board approved an acquisition adjustment for the utility's Washington Valley System purchase but not for its Peapack-Gladstone System acquisition. Ibid. The Board explained it "would continue to recognize the appropriateness of acquisition adjustments where a specific benefit can be shown, such as the acquiring of needed facilities which benefit the entire system," agreeing with Board staff and the New Jersey Division of Rate Counsel the utility had "demonstrated a tangible benefit" to ratepayers by the Washington Valley purchase, ibid., because it "acquired a well and storage tank that it would have had to construct in order to meet the supply and demand on the existing system," id. at 313. As to Peapack-Gladstone, however, the Board found "petitioner offered no evidence as to why existing ratepayers should bear the cost associated with a purchase that may be in the public interest, but does not particularly aid existing customers in the system." Id. at 314.

In the OAL, the parties stipulated that Shorelands was a Board-regulated water utility providing service to approximately 11,000 customers in Hazlet Township in Monmouth County. American Water serves approximately

5

631,000 water and fire service customers and approximately 41,000 sewer service customers. American Water purchased Shorelands for $51,468,661, a premium of $26,738,000 over its original cost less depreciation of $24,540,203, for which it sought full rate base recognition, including an acquisition adjustment of $26,738,000 to be amortized over forty years.

American Water presented the testimony of its senior director of coastal operations, Kevin Keane and its Vice President and Director of Engineering, Donald Shields, P.E., who testified that integrating the Shorelands system into American Water's adjacent Coastal North System provided both operational benefits that improved service to existing American Water customers and avoided significant capital costs of planned projects no longer necessary by virtue of the company having acquired the Shorelands system. Specifically, they emphasized Shorelands' location in Monmouth County, in the middle of an existing American Water system, "created overall lower operating pressures in the combined systems, which translates into lower energy consumption, fewer main breaks and overall greater operational savings," thereby increasing the quality of service to customers.

Keane testified the integration would "have the benefit of fully utilizing the elevated storage in both systems and should also have a positive impact on

6

power savings, potentially resulting in less pump run time during peak demands as well as not having to operate additional pumps to maintain or recover system pressures due to main break events."  He added the Company "anticipates that the ground water diversion from the Shorelands system wells will be optimized during peak production periods thus, creating a larger, more diverse water supply portfolio, because [of] the combined assets of the two companies."  Finally, he noted American Water "will also have the ability to optimize its surface water withdrawal from the New Jersey Water Supply Authority by leveraging the combined withdrawal limits of the two companies," and "[t]he anticipated result will be less purchased water costs, from the Marlboro MUA and/or the New Jersey Water Supply Authority during peak periods."

Shields emphasized the savings to ratepayers that would result from the acquisition, which allowed American Water to avoid or defer capital projects on which it had previously planned to spend millions of dollars and that would have been necessary had the Company not acquired Shorelands.  Shields testified the acquisition allowed American Water to avoid seven capital projects, totaling $29 million:  (1) an estimated $5 million project to replace the Navy Tank; (2) an estimated $3.5 million project to purchase and install "a

7

dual purpose high/low gradient tank"; (3) an estimated $5 million project to convert the Union Beach standpipe to ground storage; (4) a project to replace "five pressure reducing valves ('PRVs') in the Aberdeen zone"; (5) a project to replace "three PVRs in the Middletown zone"; (6) an estimated $3.5 million project to purchase two new Englishtown wells; and (7) an estimated $10 million project to construct "approximately 4 miles of a planned source supply main (the Raritan-Middlesex main)."

Shields further testified the integration of Shorelands allowed American Water to defer two projects that "would otherwise need to be built, or built sooner, or done more expensively but for this transaction":  (1) a "supply capital project . . . compris[ing] six ASR [aquifer storage and recovery] wells with projected capital costs of $14.9 million"; and (2) an estimated $4 million project on "certain resiliency improvements at the Newman Springs pump station."

American Water also presented the testimony of the Company's Director of Rates and Regulation, Frank X. Simpson, a C.P.A., who estimated the revenue requirement impact to customers of the Shorelands acquisition over a 40-year period.  Simpson estimated benefits to revenue requirements from the elimination or deferral of the capital projects Shields had identified and

8

compared that to his estimate of the impacts to revenue requirements from including the acquisition adjustment in rate base and amortizing it over the same period. Simpson concluded "[t]he net benefit in actual dollars of the avoided and deferred capital, offset by the rate base treatment and 40-year amortization of the [Shorelands acquisition adjustment] is a positive benefit to our customers of approximately $16 million," or $6.6 million reduced to present value using a 3% discount rate.

Rate Counsel presented the testimony of Howard Woods, Jr., a licensed professional engineer with over forty years of experience in the planning, design, construction and operation of water and wastewater utilities, including seventeen years spent at American Water. Although Woods agreed that Simpson's analysis was a reasonable way to consider the impact of the Shorelands acquisition, he testified the benefit to ratepayers in Simpson's analysis was entirely dependent on the Company's claim that it "will not spend the sums" laid out in Shields' testimony "for these or similar projects." Woods testified that "[s]hould other reasons arise that cause the Company to undertake items deferred or avoided in this analysis at any point while the acquisition adjustment is being amortized, a portion of the offsetting value to ratepayers will be lost."

9

Further, Woods pointed out that Simpson's analysis "presumes that the Company has actually decreased its overall utility plant investments by the amount shown for each year." Yet, "if the Company maintained its overall level of capital spending by using the avoided or deferred cost dollars to implement other needed improvements in other areas of its systems, customers would see the impact of those other investments in rates along with the impact of the acquisition adjustment." He testified "[t]here is nothing in [Simpson's] analysis or the Company's [written] testimonies that demonstrates that customers will actually see lower rates because of the acquisition or any of the avoided or deferred projects."

Specifically, Woods explained that "[t]he recovery of the amortization of the acquisition adjustment is a fixed, known and measurable cost" of $26,722,978, the amount the Company paid over the original cost less depreciation of those assets. If that amount were "included in rate base and amortized over 40-years, the Company's customers will pay the Company a return of and return on this excess investment and the annual amortization amount. In the first year, this is a revenue requirement of $3,964,485" according to Simpson's analysis. Woods maintained that "is cash that will be collected from customers and the amount will not be impacted by the

A-0096-21

avoidance or deferral of any of the capital projects included in Mr. Simpson's analysis."

Woods used the Navy tank, built in 1951, as an example of how "sensitive" Simpson's analysis, which projects "a theoretical benefit to ratepayers of $6,444,247" from the Shorelands acquisition, is to any changes in Shields' list of avoided and deferred capital projects. Shields had testified the Shorelands acquisition and its consolidation into the Company's "Coastal North system would not eliminate the need for the Navy Tank," which had been scheduled for replacement as inadequate for the Company's needs. With the merger of Shorelands, however, Shields testified "the Navy Tank standpipe will be adequate to serve the reconfigured and reduced coverage of the Middletown Gradient" and "would remain in service for the foreseeable future."

Woods testified that Simpson's analysis presumes the Navy Tank, sixty-seven-years old at the time of Woods' testimony, would outlast the average seventy-two-year lifespan reflected in the "current depreciation rate for distribution tanks" of its kind, by forty years. If American Water had to replace the tank at the seventy-two-year mark, customers would incur those "avoided" costs. Woods explained: "By making this single and fairly minor

11

change to the analysis [Simpson offered in evidence], the net positive benefit of $6,644,247 is reversed and the 'benefit' of the Shorelands acquisition becomes a net cost of $197,353."

Woods also testified that American Water could similarly decide it needed the two $3,500,000 Englishtown Wells in light of Shields' testimony that "[t]he Coastal North System has a reliable maximum day supply deficit" and the rapid growth of the Lakewood area where the wells are located, and the $4 million Newman Springs Clearwell, "essentially a storm hardening and resiliency project," that Shields testified could be deferred to 2032 in his calculation of the savings to the Company by the Shorelands acquisition. According to Woods, if American Water undertook just those three projects as originally scheduled, "[t]he net present value of the avoided and deferred projects, which is shown as a positive benefit of $6,644,247 for ratepayers would become a net present value loss of $25,452,118."

American Water acquired the Haddonfield Borough system through a competitive bidding process. The Company paid $28.5 million for the system, $1,798,369 over its $26,911,098 original cost less depreciation, outbidding the next-highest bidder by $537,400. The Company sought full rate base

12

recognition for its purchase, including an acquisition adjustment of $1,798,369 to be amortized over forty years.

The Company presented the testimony of David Forcinito, P.E., Senior Director of Operations for Southwest Operations, for Burlington, Camden, Gloucester and Salem Counties. Forcinito testified about "the operational benefits as well as the customer service enhancements resulting from [the Company's] acquisition of the Borough of Haddonfield's water system."

According to Forcinito, integration of the Haddonfield and American Water systems increased the redundancy, "resiliency and water quality in both systems." He testified "full integration of the two distribution systems resulted in ten additional connections . . . , bringing the total number of connections between the two systems to twelve," thus improving "the resiliency of supply of both systems to withstand operational disruptions such as main breaks." Integration also eliminated "five dead-end water mains in the Haddonfield system and two dead-end mains in [American Water's] system," allowing water to flow continuously, thereby reducing water age "and the potential for water quality issues in the distribution system" and attendant customer complaints.

13

Forcinito also testified "the addition of the Haddonfield system adds to [American Water's] economies of scale, creating additional value for all customers," by, for example, reducing the "per customer-cost of state-mandated water sampling requirements . . . because these costs can be managed in a more holistic and efficient manner in the Southwest Region, rather than in an isolated, system-by-system basis, and customer complaints about water quality are reduced as a result." He explained these economies of scale also "provide[ ] a market advantage: Material can also generally be purchased at a much lower cost through American Water's purchasing power."

Vice President and Director of Engineering Shields testified the Haddonfield system "was in need of upgrades at two wastewater pumping stations, Coles Mill and Roberts Avenue," which "were subject to [New Jersey Department of Environmental Protection] inspections and had received notices of deficiency and related Notices of Violation for lack of appropriate maintenance." Shields also testified American Water built "a new pumping station, Atlantic Avenue, . . . to retire a failing gravity sewer main located behind the Wedgewood Swim Club" that "ran adjacent to the Cooper River."

Shields and Forcinito testified that integration allowed it to decommission Haddonfield's Cottage Avenue Standpipe located on a small lot

14

between two houses, which, in addition to insufficient volume of equalization and emergency storage, suffered from water quality issues related to excessive water age. Forcinito testified that decommissioning the standpipe allowed American Water to "improve[ ] the water age in the distribution system," avoid "a safety hazard" to nearby residences, and eliminate "the need to recoat" the tank. According to Shields, "[a]bsent [American Water] ownership, the Cottage Avenue Standpipe would need to be demolished and replaced with a modern, appropriately-sized elevated storage tank at the cost of approximately $5 million (before considering the costs of the ongoing maintenance needs of such a tank)."

Forcinito testified that American Water was also able to decommission Haddonfield's Centre Street water treatment plant, which had "periodic flooding" and "limited automation" requiring "manual operation of its filtration process," and "transfer the water allocation to an existing [American Water] allocation permit." Forcinito explained retiring the plant "eliminated the need to undertake a costly upgrade of the plant and bring it up to current Company standards" benefiting both former Haddonfield customers and existing American Water customers who would pay "a lower customer cost."

A-0096-21

American Water witness Stephanie Cuthbert, P.E., C.M.E., who served as the water and sewer engineer for the Borough of Haddonfield for the seven years preceding the Company's acquisition, testified that Haddonfield's wells were located in an aquifer that DEP has designated as "critical area no. 2" in which new diversions of groundwater are prohibited, making the allocation "valuable for the entity that owns the rights to the allocation and [of] . . . inherent value to the Haddonfield System."  According to Cuthbert, "[t]his very valuable diversion can be re-assigned to other wells owned by [American Water] and does not require the same level of treatment for iron and manganese removal as the groundwater diverted from the Haddonfield wells; thereby providing a secondary benefit" to the Company.

Rate Counsel's witness Woods testified the Haddonfield acquisition undoubtedly provided measurable benefits to former Haddonfield customers but no benefit to existing American Water customers.  Woods testified the "significant benefits to Haddonfield ratepayers in the short run" included an immediate three-year rate freeze, American Water's five-year "commitment to invest $16 million in system improvements," cost savings from decommissioning the Cottage Avenue Standpipe and Centre Street Water

16

Treatment Plant and "retention by the Borough of antennae revenues for a period of ten years."[2]

By contrast, Woods found the benefits to existing American Water customers to be illusory, explaining they "can only be described in the most general of terms and . . . are only likely to be realized at some distant point in the future when Haddonfield rates are equalized with the Company's statewide rates." He testified existing customers would not benefit from American Water's Atlantic Avenue Lift Station ($2,009,191), Roberts Avenue Sewer Lift Station ($2,225,655), and Coles Miller Sewer Lift Station ($4,978,799) projects, "which alone represent more than half of the $16 million promise made to Haddonfield." In addition, Woods testified the Company transferred

---

[2] Woods testified that included in the Company's $28,500,000 bid for Haddonfield's water and sewer systems was an offer "to maintain the existing water rates for Haddonfield ratepayers for a period of three years from the date of closing," free water and sewer service to seven Borough-owned buildings and a commitment "to make capital improvements to the Haddonfield systems starting with an estimated $6.5 million in improvements within the first 12 months of closing and a total of an additional $9.5 million in capital improvements over the first five years." In addition to the total $16 million in capital improvements in the five-year period after closing, "the Company also committed to allowing the Borough to retain revenues from cell antennae leases for a period of ten years," and to continue a Senior Citizen subsidy of Camden County Municipal Authority charges." Woods testified the voters approved those general terms and conditions of the Company's proposal in a referendum on the sale of the systems.

A-0096-21

the Borough's water allocation rights to which Cuthbert referred in her testimony "to other Company owned wells in a Company-owned system that already enjoyed a substantial surplus allocation."

Shields testified in rebuttal that "[w]hile [American Water] currently holds a surplus in water allocation or water quantity, the groundwater supplies in Critical Area 2 have changed significantly in water quality.  These allocations are important and will be used to deal with the impact of Perflourinated Compounds (PFC's) that [the Company] is experiencing in the region."  Woods responded by noting that the Company, "three years after the acquisition of the Haddonfield system, . . . still cannot quantify the impact of these groundwater quality issues or the impact that the Haddonfield acquisition may or may not have on the solution to these problems."

ALJ Jacob S. Gertsman issued a thirty-two-page initial decision, meticulously summarizing the testimony presented and the parties' arguments and recommending the denial of American Water's request for acquisition adjustments for both Shorelands and the Haddonfield systems.  Addressing first the testimony presented on the Shorelands acquisition, the ALJ found American Water had "failed to demonstrate that the capital projects specified in the petition are not proceeding."  The ALJ was persuaded by Woods'

testimony that American Water could, simply by reviving the $5 million Navy Tank project five years down the road, wipe out "the entire net positive benefit" from the present avoidance. The ALJ was also persuaded that the Company could similarly revive the Englishtown Wells and Newman Springs projects and incur significant costs that translate to higher rates.

ALJ Gertsman found Woods had presented — and American Water had failed to adequately address — "reasonable conditions where any or all the projects [on Shields' list] may proceed." The ALJ found the testimony of the Company's witnesses unpersuasive because absent any commitment by American Water not to go through with the projects, "the benefits to ratepayers are subject to reasonable conditions where any or all of the projects could proceed."[3] The ALJ found Shields' testimony that "[t]he Coastal North System

---

[3] ALJ Gertsman included this colloquy with the Company's counsel in his decision.

> Judge Gertsman: So, what are the benefits, the tangible benefits to the existing customers of New Jersey American?
>
> Counsel: I think they're well pointed out in the testimony that we have. They consist of essentially three categories for Shorelands, somewhat different categories for Haddonfield. So, for Shorelands there are seven specific projects.

A-0096-21

has a reliable maximum supply deficit" undermined the Company's assertion that the acquisition would avoid and delay, respectively, the Englishtown Wells and ASR wells projects "designed to help alleviate the capacity issues in the Coastal North System."  The ALJ explained this inconsistency "lends credence to Rate Counsel's argument that the Company's inclusion of these supported benefits to ratepayers is speculative."

ALJ Gertsman noted that

> [t]he Company has been resolute in its position that a commitment not to proceed with the projects would be irresponsible, which is plainly within its discretion. However, while it is not the proper role for this tribunal to decide if the Company should commit to avoid or defer these projects, upon review of the record it is readily apparent that the benefits of the

---

> Judge Gertsman:  And we've been through that before. So, this seems to be one of the main issues, the main factual issues in this case.  The other parties have said that there is no commitment from the Company to not actually do these projects; is that correct?
>
> Counsel:  I think it would be irresponsible to make such a commitment.  I think what we are bound by here is the record.  On this record are those projects going forward?  Testimony is clear that they're not. . . .

Judge Gertsman concluded that American Water was certainly well within its rights to conclude "that making this commitment is 'irresponsible.' However, the Company's argument that that the testimony is clear that the projects are not going forward is not supported by the record."

A-0096-21

Shorelands acquisition remain illusory, unless and until the Company has in fact made that commitment. Put simply, the benefits to ratepayers from the Shorelands acquisition can only be established if the projects do not move forward, which the Company has not met its burden to demonstrate.

The ALJ concluded American Water had thus not "met its burden to demonstrate" the Shorelands acquisition would produce "tangible benefits to ratepayers as set forth by the Board in Elizabethtown and South Jersey Gas in order to justify the burden." He further concluded the proposed Shorelands acquisition adjustment "fail[ed] to meet the requirements set forth by the Board in Elizabethtown and South Jersey Gas." The ALJ rejected the Company's assertion that Rate Counsel's position that American Water could revive its avoided and deferred capital projects was "entirely speculative and unsupported," explaining the burden was on the Company "to demonstrate by a preponderance of the credible evidence" that it would not complete these projects in the future.

ALJ Gertsman agreed with Board Staff and Rate Counsel "that [American Water] has failed to demonstrate that the acquisition provides tangible benefits to ratepayers due to its refusal to commit to avoiding and/or deferring these capital projects," which "would potentially result not in a net benefit to ratepayers, as required by Elizabethtown and South Jersey Gas, but

21

rather a net present value <u>loss</u>."  As ALJ Gerstman succinctly explained, "the benefits to ratepayers from the Shorelands acquisition can only be established if the projects do not move forward, which the Company has not met its burden to demonstrate."

As to the Haddonfield acquisition, ALJ Gertsman found "the record fails to demonstrate that the acquisition provides benefits to existing [American Water] customers."  The ALJ found "particularly compelling" Woods' testimony that Haddonfield ratepayers would experience significant short-run benefits but could not identify "any short-term synergies that would benefit existing New Jersey American ratepayers."

The ALJ concluded American Water failed to meet "its burden to demonstrate" the Haddonfield acquisition produced "tangible benefits as set forth by the Board in <u>Elizabethtown</u> and <u>South Jersey Gas</u>" so as "to justify the burden of this premium on its ratepayers," and that the proposed Haddonfield acquisition adjustment "fail[ed] to meet the requirements set forth by the Board in <u>Elizabethtown</u> and <u>South Jersey Gas</u>."  He agreed with Board Staff that American Water failed to show "any tangible benefits to existing ratepayers," and that "the burden to ratepayers far exceeds any intangible benefits claimed by the company and would strike an unjust balance between

ratepayer interests and the Company." The ALJ credited Wood's testimony that the acquisition would provide virtually no benefits to American Water's existing customers, finding Woods had "successfully rebutted" Shield's testimony that the water allocation permit the Company had acquired through Haddonfield would be useful in addressing the PFC's in the groundwater. The ALJ explained American Water "has cited various benefits that solely benefit former Haddonfield customers while it remains unable to quantify the impact of the acquisition on its ability to address the PFC's, which would conceivably benefit its existing customers."

After receipt of the parties' exceptions, the Board issued a detailed fourteen-page final order adopting the ALJ's initial decision, which it found "to be just and reasonable, in the public interest, and in accordance with the law." In its Discussion and Findings, the Board first denied American Water's motion for leave to file a sur-reply to Rate Counsel's reply exceptions, explaining American Water "fail[ed] to cite to any case law or rule in support of its position" that it should be permitted to address by sur-reply "Rate Counsel's alleged mischaracterization of the established Board precedent on acquisition adjustments." Finding the Company's argument limited to its claim "that existing [American Water] customers benefit from the acquisitions," the

23

Board identified the issue before it as "whether the acquisitions of the Haddonfield and Shorelands systems provided any specific and tangible benefits to [American Water's] legacy customers."

The Board denied the Shorelands acquisition adjustment, finding the Company "failed to meet its burden to show that the Shorelands acquisition provides a benefit to ratepayers" and that "passing this large premium to ratepayers would strike an unfair balance between ratepayers and the Company because [American Water] would earn a return on investment on a premium which does not tangibly benefit ratepayers." The Board rejected the Company's arguments that the "acquisition resulted in the cancellation of $29,000,000 in previously planned capital investments," as well as "benefits from deferred capital projects and . . . significant synergistic savings," finding, as the ALJ did, "that the inclusion of these improvements and their resulting benefits are speculative." The Board explained "the testimony indicates that there were little or no synergy savings resulting from the Shorelands acquisition" and "NJAWC's claim that it will avoid capital costs is not supported by any tangible evidence," as "NJWAC may very well still endeavor to complete the projects which it claims it will not, at a later date," so "there

are no guarantees that the Shorelands acquisition will result in lower overall capital costs to [American Water's] existing customers."

The Board likewise denied the Haddonfield acquisition adjustment, finding "the burden to ratepayers far exceeds any tangible benefits claimed by [American Water] and would therefore strike an unjust balance between ratepayer interests and the Company." The Board explained it was unpersuaded that the acquisition "provided tangible benefits to ratepayers," as the "greatest benefits cited in the record were with respect to the avoided capital of replacing or fixing existing Haddonfield facility, but this benefit only benefits former Haddonfield customers," and "existing [American Water] ratepayers are burdened by the acquisition because the cost of providing service to the Haddonfield system and the costs of the acquisition are significant."

American Water raises the following issues for our consideration:

I. THE BPU IMPROPERLY IMPOSED A NEW STANDARD TO DENY THE SHORELANDS ACQUISITION ADJUSTMENT THAT IS INCONSISTENT WITH ITS PRIOR ORDERS ESTABLISHING ITS POLICY ON THIS ISSUE WITHOUT EXPLAINING OR EVEN ACKNOWLEDGING ITS CHANGE OF POSITION.

II. THE NOVEL "GUARANTEE" REQUIREMENT APPLIED TO THE SHORELANDS ACQUISITION IMPERMISSIBLY: (A) IMPOSED AN UNHEARD OF STANDARD OF PROOF OF ABSOLUTE CERTAINTY WHERE THE PROPER STANDARD WAS

PREPONDERANCE OF THE EVIDENCE AND (B) REQUIRED [AMERICAN WATER] TO DISPROVE RATE COUNSEL'S UNSUBSTANTIATED CLAIMS.

A. The BPU imposed an unheard of absolute certainty standard of proof on [American Water].

B. The ALJ and BPU improperly required [American Water] to provide a guarantee in order to disprove Rate Counsel's unsubstantiated claims.

III. THE BPU'S DENIALS OF THE ACQUISITION ADJUSTMENTS FOR SHORELANDS AND HADDONFIELD WERE NOT SUPPORTED BY SUFFICIENT CREDIBLE EVIDENCE.

A. The BPU's rejection of the Shorelands Acquisition Adjustment relied on mere speculation that the projects "may" go forward, ignored [American Water's] evidence that the Navy Tank would not be replaced, and failed to acknowledge the contradictions in Mr. Woods' Navy Tank testimony.

B. The BPU failed to make any factual findings regarding the benefits of the Haddonfield acquisition to existing [American Water] customers, and the ALJ erred in holding that benefits that could not be specifically quantified were insufficient.

Our review of the record convinces us that none of these arguments is of sufficient merit to warrant any extended discussion in a written opinion. R. 2:11-3(e)(1)(E).

Our assessment of the BPU's decision is governed by a familiar standard of review. "An appellate court reviews a final agency decision with deference, and will not reverse the ultimate determination of an agency unless the court

26

A-0096-21

concludes that it was 'arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence, or that it violated legislative policies' expressed or implied in the act governing the agency." In re Freshwater Wetlands Gen. Permit No. 16, 379 N.J. Super. 331, 341 (App. Div. 2005) (quoting Campbell v. Dep't of Civil Serv., 39 N.J. 556, 562 (1963)). As our Supreme Court has explained, however, "rate making is a legislative and not a judicial function, and that the [BPU], to which the Legislature has delegated its rate-making power, is vested with broad discretion in the exercise of that authority." Petition of N.J. Am. Water, 169 N.J. at 188 (quoting In re Petition of Pub. Serv. Coordinated Transp., 5 N.J. 196, 214 (1950)).

Although the Board's decisions "are entitled to presumptive validity," Petition of Jersey Cent. Power & Light Co., 85 N.J. 520, 527 (1981), they are not, of course, immune from review. "The Legislature has authorized courts expressly to 'review any order of the board and to set aside such order in whole or in part when it clearly appears that there was no evidence before the board to support the same reasonably or that the same was without jurisdiction of the board.'" Petition of N.J. Am. Water., 169 N.J. at 188 (quoting N.J.S.A. 48:2-46). We will not "sustain an action by the BPU, or that of any other administrative agency, when that action is found to be 'arbitrary, capricious,

unreasonable, or beyond the agency's delegated powers.'" Ibid. (quoting In re Amendment of N.J.A.C. 8:31B-3.31, 119 N.J. 531, 544 (1990)).

Having reviewed this extensive record, we cannot find the Board applied a higher or different standard than the one it adopted in Elizabethtown. The Board accurately identified the issue as whether American Water carried its burden to demonstrate "specific and tangible benefits" to ratepayers from the acquisitions, and, after reviewing extensive direct, rebuttal, and surrebuttal testimony reasonably found the Company had fallen well short of doing so as to both acquisitions.

We specifically reject that the ALJ or the Board imposed any requirement on the Company that it "guarantee" it would not move forward on any of the list of avoided or deferred capital projects it relied on to demonstrate "that a specific and tangible benefit inured to ratepayers from the acquisition." In re S. Jersey Gas Co. BPU 843-184 (Bd. of Pub. Utils. Dec. 30, 1985). The obvious point of Wood's testimony was to demonstrate how dependent any tangible benefit to legacy ratepayers from the Shorelands acquisition was on American Water not moving forward with nearly every one of the projects on Shields' lengthy list. Using just three examples from Shields' list — the aged Navy Tank, the two Englishtown Wells located in an

A-0096-21

area of high population growth in the Coastal North System already subject to "a reliable maximum day supply deficit" and the Newman Springs Clearwell, "essentially a storm hardening and resiliency project" — Woods demonstrated the $6,644,247 positive benefit for ratepayers of "[t]he net present value of the avoided and deferred projects" the Company touted would "become a net present value loss of $25,452,118" were the Company to find it necessary to proceed on those three projects only.

All the ALJ found, and the Board adopted, was that putting items on a list of avoided and deferred capital projects was not sufficient to establish "a specific and tangible benefit inured to ratepayers from the acquisition." In light of the reasonable questions Rate Counsel's witness raised about the Company's ability to avoid or defer all of the capital projects it projected as a result of the Shorelands purchase, it was incumbent on the Company to establish by a preponderance of the evidence that the benefits to ratepayers were not illusory — not as it argues that the Board imposed a "novel 'guarantee' requirement that the Company establish by "an unheard of absolute certainty standard of proof."

Notwithstanding the Company's efforts to cast its claims as errors of law, American Water's arguments on appeal reduce to quarrels with the

A-0096-21

agency's fact-finding which we are simply in no position to reject. See

N.J.S.A. 48:2-46; Petition of N.J. Am. Water., 169 N.J. at 188. Because the

Board's finding that the Company failed to carry its burden to establish by a

preponderance of the evidence that a specific and tangible benefit inured to the

Company's ratepayers from the Shorelands acquisition is supported by

sufficient credible evidence on the record as a whole, we affirm. See R. 2:11-

3(e)(1)(D). The Company's claims as to error on the rate treatment of its

Haddonfield acquisition are without sufficient merit to warrant any further

comment here. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0096-21